639 So.2d 721 (1994)
STATE of Louisiana
v.
Ivrin BOLDEN, Jr.
No. 93-KK-1933.
Supreme Court of Louisiana.
July 5, 1994.
A.M. Stroud, III, Blanchard, Walker, O'Quin & Roberts, Shreveport, M. Allyn Stroud, Brook, Morial, Cassibry, Pizza & Adcock, New Orleans, for applicant.
Richard Ieyoub, Atty. Gen., Jerry J. Jones, Dist. Atty., Charles Leslie Cook, Asst. Dist. Atty., for respondent.
MARCUS, Justice[*].
At issue is whether a defendant acquitted of a crime may be subsequently tried for perjury based on a later statement made by him contradicting his testimony at the former trial.
On March 20, 1987, defendant was indicted for the second degree murder of Brenda Lee Spicer. At trial, the state sought to show that defendant murdered her because he was jealous of the close relationship between Spicer *722 and defendant's girlfriend, Joel Tillis. Defendant testified on his own behalf and specifically denied killing Spicer:
Q. Did you meet Brenda Spicer at that storage locker on March 5th?
A. No, I did not at any time that day.
Q. The only time you saw Brenda Spicer is when she gave you that camera and the $5.00.
A. I saw her earlier in the dorm and the last time I saw her was at the intersection when she had given me the camera.
Q. Did you have any kind of physical struggle or contact with Brenda Spicer that day?
A. No, I didn't, didn't have any contact with her at all physically.
Q. Did you have any kind of sexual intercourse with Brenda Spicer?
A. Never did.
Q. You never have?
A. No, I haven't.
Q. Did you kill Brenda Spicer on March 5th?
A. No, I did not.
At the conclusion of trial, the jury returned a verdict of "not guilty."
Subsequently, defendant and Tillis moved to Memphis, Tennessee. In 1990, Tillis disappeared, and her body was later found in Arkansas. Defendant was a suspect in her disappearance, but was never arrested and later moved to New Jersey. Approximately two years later, defendant filed a complaint against a woman named Jennifer Spurlock and was summoned to the Burlington County Prosecutor's Office in New Jersey in connection with the complaint. In the course of questioning, defendant confessed to the killing of Joel Tillis,[1] and made the following statement concerning Brenda Spicer:
Q. Other than Joel Tillis, who is the other girl that you killed?
A. Brenda Spicer.
Q. And what were the circumstances surrounding the death of Brenda Spicer?
A. I don't know, she, she made me mad too, I guess. I was, I always wanted to be, with whatever girl I am, I always wanted to be, have some attention with them and just be with them without somebody else, I guess getting her attention. Joel seemed to always give her a lot of attention and, with, you know, with me around, and I didn't like that. I tried to, you know, talk to her, talk to Joel about it, and you know, ask her about it, but she kept on.
Q. What were the circumstances surrounding the death of Ms. Spicer?
A. I went, um, I asked her come to like, we had a storage unit, and I asked her to come with me and then I was trying to talk to her, you know, I had been asking her and asking her to, you know, try to give me some time with Joel and she just, you know, she just kept saying that she was going to be with Joel no matter what, and so I just, I got mad with her and I strangled her.
Q. And where did this take place at, the storage area?
A. Yeah.
Q. And where was the storage area located?
A. Not far from the college campus in Monroe, Louisiana.
Q. And after you strangled her, what did you do?
A. Took her body back to the campus and put it in the dumpster and went back to the game or I went back to the dorm or something.
As a result of the New Jersey statement, defendant was charged in Louisiana with perjury.[2] The bill of information provided *723 that defendant intentionally and knowingly committed perjury when he was being tried for the murder of Brenda Spicer "by testifying in response to questions concerning whether he had physical contact with and/or killed Brenda Spicer, a matter material to the issue or controversy in question." Defendant filed a motion to quash the bill of information. After a hearing, the trial judge denied the motion. Defendant applied to the court of appeal for supervisory review. The court denied the application:
WRIT DENIED.
None of the controlling cases cited by applicant concern a perjury defendant who, after testifying that he did not commit a previous offense and being acquitted, subsequently admitted that indeed he committed the acquitted for crime. Even a previous determination of credibility should not foreclose (under the double jeopardy clause and included collateral estoppel doctrine) a perjury prosecution if, at the latter trial, the state produces new and direct evidence that defendant lied under oath at his first trial, thus permitting the trier of fact to conclude beyond a reasonable doubt that perjury transpired.
Moreover, applicant will have an adequate remedy on appeal in the event of a conviction.
Upon defendant's application, we granted certiorari to consider the correctness of the ruling denying the motion to quash. 629 So.2d 1155.[3]
The sole issue before us is whether defendant, having been found not guilty of Spicer's murder, may be subsequently tried for perjury based on a later statement made by him contradicting his sworn testimony at the murder trial.
Defendant argues, and we agree, that the controlling case in this area is Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), in which the Supreme Court held that the doctrine of collateral estoppel was embodied in the Fifth Amendment guarantee against double jeopardy.[4] The Court defined collateral estoppel as meaning when an "issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." Id. at 443, 90 S.Ct. at 1194. In order to apply this doctrine, the Court posited the following test:
Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." The inquiry "must be set in a practical frame and viewed with an eye to all the circumstances of the proceeding."

Id. at 444, 90 S.Ct. at 1194 (footnotes and citations omitted).
In the context of a perjury indictment relating to testimony given at a former trial on a substantive charge, courts have held that the doctrine of collateral estoppel does not bar the perjury prosecution unless the issues of fact central to that prosecution were necessarily determined in the former trial. United States v. Williams, 341 U.S. 58, 71 S.Ct. 595, 95 L.Ed. 747 (1951); United States v. Haines, 485 F.2d 564 (7th Cir.1973), cert. denied, 417 U.S. 977, 94 S.Ct. 3184, 41 L.Ed.2d 1147 (1974); State v. Conway, 661 P.2d 1355 (Okla.Crim.App.1983). With these *724 precepts in mind, we now turn to an examination of the record in defendant's former trial.
On the morning of March 6, 1987, the partially nude body of Brenda Spicer was found in a trash dumpster at the Northeast Louisiana University (NLU) campus in Monroe, Louisiana. The coroner determined the time of death as being approximately 7:00 p.m. on the previous day. An autopsy revealed that the cause of death was heart failure due to strangulation. There was sperm in the victim's vagina and rectum, but no evidence of trauma in either area. Tests performed on the seminal fluid and saliva taken from the victim's breasts indicated they came from a type A secretor. Defendant was a type A secretor, although the testimony indicated that approximately 80% of the population secretes ABO blood group substance in their bodily fluids. Hand prints were also found on the body, but the fingerprints could not be determined.
Agnella Katrice Lee testified that she had shared a dorm suite with fellow ladies' basketball players Derunzia Johnson, Joel Tillis and Lavette Lloyd. She testified that Spicer, a former basketball player, had also lived in the suite. Although Spicer had resigned from school by March, 1987, Lee testified that Spicer stayed in the room when she visited the campus and was there on March 5, 1987. At approximately 4:30, Spicer told Lee she had to meet defendant to get something from him for Joel. Spicer said she was "having a little fling" with defendant, but Lee took this to be a joke. At approximately 6:00, Lee received a phone call from defendant, asking for batteries for a camera. She went down to bring him the batteries, then got dressed to go to the game, which started at 7:00. She saw defendant at the game, but did not see Spicer.
Linda Harper, NLU's ladies' basketball coach, testified that she received a call from defendant asking her to help him get his girlfriend back. Defendant complained to her that whenever he came to visit Tillis, Spicer wanted to "hang around" and wanted to go everywhere they went.
Joel Tillis testified that she had known Spicer since 1986, when Spicer was a freshman and she was a senior. Tillis described her friendship with Spicer "as being a big sister." She testified that on March 5, 1987, she went to the coliseum at 2:00 for shooting practice accompanied by Spicer. Defendant was also there. Tillis left the coliseum at approximately 2:45 with defendant and went with him to clean out his mini-warehouse, staying there for about twenty minutes. Tillis stated both she and defendant had keys to the warehouse, and testified that Spicer had been to the warehouse several times during the semester to get her fan, using Tillis' key. When Tillis returned to her room, she had a message that a local TV station wanted to interview her. She and defendant went to the interview, then went to get ice cream. Tillis returned to her room at 4:30 to meet her mother. Defendant did not go up to her room, but stayed downstairs with two friends who had come in with her mother. Tillis went to eat with her mother. She returned to her room at approximately 5:00 and saw Spicer there. Tillis had instructed her mother to give defendant her camera and $5.00 for film. Spicer got the camera and money from Tillis' mother and told Tillis she was supposed to meet defendant in front of the Student Union Building. Spicer drove Tillis to the coliseum, dropping her off at approximately 5:45. This was the last time Tillis saw Spicer alive. She saw defendant at the game, taking pictures on the floor.
Vincent Lee, a student at NLU, testified that he went to the basketball game on March 5, 1987. He arrived at the game when it was almost half time. He observed defendant running away from the coliseum.
Defendant testified that he had met Tillis while attending NLU and started dating her exclusively. After graduating from NLU, he began attending medical school in New Orleans in the fall of 1986. He first met Spicer when she had come to visit Tillis. He stated that he got along well with Spicer, although they had some "differences" concerning Spicer's friendship with Tillis. On March 5, 1987, defendant had planned to come to the basketball game, since it would be Tillis' last home game. Defendant arrived at the NLU campus at about 2:15 and went to the coliseum to watch Tillis at shooting practice. After *725 practice, he and Tillis went to clean out his storage locker. They then went to the interview at the TV station, went to get ice cream, then returned to Tillis' dorm. He testified that the first time he saw Spicer that day was when he was down in the lobby of the dorm. At around 5:25, defendant decided to go look for his former roommate, Calvin Robinson, at the gym where they normally played basketball. Unable to find Robinson, defendant drove back toward Tillis' dorm. On the way, he saw Spicer in her car, and she waved him over. Defendant walked over to her car, and she handed him the camera and $5.00 and told him that Tillis wanted him to get some film for the camera. Defendant took the camera and went to K-Mart to get some film. He returned to campus at approximately 6:00. He learned that the batteries were dead in the camera and telephoned Tillis' room. Lee answered the phone and brought the batteries to him. After installing the batteries, defendant took a picture of Joel's friends, Matt and Eddie, in the lobby. At about 6:15, defendant, along with Joel's mother and sister walked to the coliseum. After they found seats, defendant went down to the floor to take close up pictures of the girls running out. After taking pictures of the pre-game ceremony, defendant returned to his seat. At some point near the end of the first half, defendant left his seat to go to the restroom. He came back toward the end of half time and stopped to talk with a friend for a few minutes. By the time he had taken his seat, the second half buzzer had gone off. About five or ten minutes later, defendant took Tillis' sister to get a drink at the concession stand. After the game ended, defendant went down on the floor to get some autographs. Tillis asked defendant to get some tennis shoes out of his car that they had retrieved earlier from the storage locker. On the way back to the coliseum, defendant saw Tillis' car parked on the street. Defendant decided to drive Tillis' car back to the coliseum, since Tillis' mother had complained that her feet were hurting. Defendant drove Tillis, her mother and friends back to the dorm. Defendant then drove back to his apartment in New Orleans. He received a call from Tillis at approximately 2:15 in the morning, telling him that Spicer was missing. The next morning, Tillis' mother called him and told him Spicer was found dead.
Having reviewed the record, we find that the jury decided that the state failed to prove beyond a reasonable doubt that defendant murdered Brenda Spicer. Clearly, the doctrine of collateral estoppel bars the state from relitigating the issue of whether defendant murdered Spicer. However, it is arguable whether the jury necessarily decided the issue of whether defendant was telling the truth when he testified under oath that he did not kill Brenda Spicer or have physical contact with her. This was not a situation where the jury was presented with two conflicting versions of the facts and forced to determine the veracity of one over the other. Cf. United States v. Sarno, 596 F.2d 404 (9th Cir.1979); Commonwealth v. Hude, 492 Pa. 600, 425 A.2d 313, 321 (1980). The state presented no eyewitness testimony contradicting defendant's assertions that he did not kill Spicer or have physical contact with her. Rather, the state's case was based on circumstantial evidence showing that defendant had the motive and opportunity to kill Spicer.
Of course, in any case where the defendant has testified and been acquitted, it could be said that the jury has passed on his credibility and found him truthful, and a subsequent prosecution for perjury should be barred. However, even assuming that defendant's credibility was necessarily decided by the jury, we find that under the unique circumstances of this case, the doctrine of collateral estoppel does not bar defendant's prosecution for perjury.
The major factor that distinguishes this case from all other reported cases we have examined is that in this case, the state has obtained new evidence not available to it during the original trial that defendant testified falsely under oath. Several cases have suggested in dicta that when the state produces new and additional evidence that defendant lied under oath at his first trial sufficient to permit the trier of fact to conclude beyond a reasonable doubt that perjury has been committed, the doctrine of collateral estoppel does not bar a prosecution for *726 perjury. United States v. Nash, 447 F.2d 1382 (4th Cir.1971) (Winter, J. concurring); Kuskulis v. United States, 37 F.2d 241 (10th Cir.1929); Allen v. United States, 194 F. 664 (4th Cir.1912); see also, Note, Perjury by Defendants: The Uses of Double Jeopardy and Collateral Estoppel, 74 Harv.L.Rev. 752, 763 (1961).
We believe that such a rule comports with the fundamental policy considerations behind the doctrine of collateral estoppel when applied in the context of perjury. On the one hand, there is a concern that allowing an acquittal to insulate the defendant from perjury will give a defendant "an uncontrollable license to testify falsely," with a resulting detriment to the reliability of evidence. On the other hand, there is an apprehension that allowing a prosecution for perjury will give the state a "second shot" at defendant for the same wrong, or allow an overzealous prosecutor to use the perjury trial to retry issues already determined in defendant's favor. Adams v. United States, 287 F.2d 701, 703 (5th Cir.1961); Commonwealth v. Hude, 425 A.2d 313, 318 (Pa.1980). The concern that the state should not be given a second chance based on the same evidence was central to the Court's holding in Ashe:
In this case the State in its brief has frankly conceded that following the petitioner's acquittal, it treated the first trial as no more than a dry run for the second prosecution: "No doubt the prosecutor felt the state had a provable case on the first charge and when he lost, he did what every good attorney would dohe refined his presentation in light of the turn of events at the first trial." But this is precisely what the constitutional guarantee forbids.

397 U.S. at 447, 90 S.Ct. at 1196 (emphasis added).
In the present case, it is clear the state is not attempting to rehash or refine the evidence used in the first trial in order to take a "second shot" at defendant. Rather, the state in good faith has obtained new and additional evidence that was not previously available to it indicating that defendant testified falsely under oath during the former trial. Under these circumstances, applying the doctrine of collateral estoppel with "realism and rationality" as required by Ashe, we believe that the state should not be barred from prosecuting defendant for perjury.[5]
In sum, assuming that defendant's credibility was necessarily at issue in the former trial, we find that the present prosecution for perjury is not barred, since the state is able to produce new and additional evidence that defendant testified falsely under oath during the former trial.[6] Hence, we find the trial court correctly denied defendant's motion to quash.

DECREE
For the reasons assigned, the judgment of the district court denying the motion to quash is affirmed. The case is remanded to the district court for further proceedings.
WATSON, J., dissents, believing that conviction of perjury would necessitate a finding of guilt on a charge of which he has been acquitted.
*727 ORTIQUE, J., dissents and assigns reasons.
LEMMON, J., concurs and assigns reasons.
ORTIQUE, Judge, dissenting.
The United States Supreme Court held in Grady v. Corbin, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), "that the Double Jeopardy Clause bars subsequent prosecution if, to establish an essential element of an offense charged in that prosecution, the government will prove conduct that constitutes an offense for which the defendant has already been prosecuted." 495 U.S. at 510, 110 S.Ct. at 2087. Clearly, under Grady, Ivrin Bolden's prosecution for perjury would be barred.
In 1993, the U.S. Supreme Court revisited the issue of what test is appropriate in determining whether the Double Jeopardy Clause bars a subsequent prosecution. In revisiting the issue, the Court overruled Grady, finding it to have established a test that is unstable in its application. Additionally, the Court found that Grady "[contradicted] an unbroken line of decisions, contained less than accurate historical analysis and produced confusion." U.S. v. Dixon, ___ U.S. ___, ___, 113 S.Ct. 2849, 2864, 125 L.Ed.2d 556 (1993).
However, the Court in overruling Grady did not address the effect of the collateral estoppel aspect of the Double Jeopardy Clause nor the "issues necessarily decided" rule emanating therefrom. The Court recognized that under Ashe v. Swenson, relied upon by the majority in the case sub judice, an acquittal in the first prosecution may well bar subsequent prosecution for a separate offense where the government has lost an earlier prosecution involving the same facts (emphasis in original) ___ U.S. ___, ___, 113 S.Ct. 2849, 2860.
But this truth has been self-evident to legal scholars since Blackstone's Commentaries were reviewed by Hamilton, Madison, Jefferson and Jaystalwart framers of our Constitution:
"[T]he plea of autrefoits acquit, or a former acquittal, is grounded on this universal maxim of the common law of England, that no man is to be brought into jeopardy of his life more than once for the same offence."[1]
And to Thurgood Marshall, whose brilliant discourse on this hallowed principle, steeped in Greek and Roman precepts of justice, has been referenced juris et de jure![2]
In the case at bar, Bolden has argued that he confessed to New Jersey officials solely for the purpose of frightening a woman who was unwilling to end her relationship with him. By making this argument, Bolden puts the prosecution in a position of having to prove defendant lied in the previous trial only by proving that he in fact killed Joel Tillis and therefore his testimony denying same was false.
The majority concludes, based upon Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), its progeny and cases decided prior to Ashe, that defendant's assertion that his prosecution on a charge of perjury subsequent to an acquittal on a charge of second degree murder is barred by the doctrine of collateral estoppel and double jeopardy lacks merit. I respectfully dissent.
The majority adopts the "issues necessarily adjudicated" rule annunciated in United States v. Williams, 341 U.S. 58, 71 S.Ct. 595, 95 L.Ed. 747 (1951) and followed in United States v. Haines, 485 F.2d 564 (7th Cir.1973), cert. denied, 417 U.S. 977, 94 S.Ct. 3184, 41 L.Ed.2d 1147 (1974) and State v. Conway, 661 P.2d 1355 (Okla.Crim.App.1983). In the seminal case relied upon by the majority, the Court found that a subsequent prosecution for perjury was not barred where acquittal on a charge of aiding and abetting abuse of a prisoner under color of state law did not constitute a determination that three other officers did not see a fellow officer abuse a prisoner. The Court determined, there was no double jeopardy where the jury reached no verdict on the charge of conspiracy; thus *728 the issue was not necessarily adjudicated in the previous trial. Any careful analysis demonstrates that Williams, supra, is distinguishable from the case at bar. The jury, in the case before us, rendered a verdict of acquittal in Bolden's trial for murder. At that trial, defendant Bolden testified and denied that he had killed and/or raped Brenda Spicer. The jury in fact specifically accepted as true that denial or else, he would not have been acquitted.
I conclude that a subsequent prosecution for perjury is, in this case, barred if not by the Double Jeopardy Clause per se, by the collateral estoppel aspect of the Fifth Amendment. This inescapable conclusion reached hereinabove has been consistently validated for almost a half century. Where the fact to which a defendant testifies in a previous trial forms the basis of a perjury charge, as in the case at bar, and that fact constituted the act which formed the basis of the crime with which the defendant was initially charged, and that fact is necessarily determinative of the issue, acquittal on the first offense bars a subsequent perjury prosecution. Ehrlich v. United States, 145 F.2d 693 (5th Cir.1944). In United States v. Richard, 892 F.2d 761 (9th Cir.1989), defendant was initially charged with transporting illegal aliens. During trial, defendant submitted a taxi trip log allegedly written on the day he was arrested. Defendant was acquitted on the alien smuggling charge. Nearly one year later, defendant was tried for giving false testimony, obstructing justice and using a false document; defendant challenged his conviction on these charges on the ground of double jeopardy. The court of appeals' analysis involved three steps. First, the issues in the two actions must be identified for purposes of determining the similarity of issues. Secondly, the record in the prior case must be examined to decide whether the issue was litigated in the first case. Thirdly, the record in the prior proceeding must be examined to ascertain whether the issue was necessarily decided in the first case. Finding that the jury may have acquitted defendant without determining whether the trip log was authentic, the authenticity of the log was not necessarily determined by his acquittal; thus defendant could be tried based upon fabrication of the log without exposing defendant to double jeopardy. Could the jury in the case at bar have acquitted Bolden without believing he was truthful when he denied killing Spicer?
The majority overlooks an important aspect of the "issues necessarily adjudicated" rule, which requires a distinction between ultimate facts and evidentiary facts. Ultimate facts are those upon which a defendant's liability or exoneration depend, while evidentiary facts are those facts established by the evidence. This distinction is significant since the doctrine of collateral estoppel applies only to issues that were ultimate in a first proceeding. Note, Collateral Estoppel in Criminal CasesA supplement to the Double Jeopardy Protection, 21 RUTGERS L.REV. 274 (1967). Where the fact to which a defendant testifies and upon which the perjury charge is based was the act which constituted the crime of which a defendant is accused and the fact is necessarily determinative of the issue, acquittal of the first offense bars subsequent prosecution for perjury. Ehrlich v. United States, 145 F.2d 693 (5th Cir.1944). Based upon Ashe as well as Ehrlich, applying the "issues necessarily adjudicated" rule in the case at bar, Bolden's prosecution for perjury is barred. The perjury charge in this case is based upon the act which constituted the crime of which defendant was accused. Defendant's testimony that he did not kill or rape Spicer, regards an ultimate fact that is necessarily determinative of the issue of Bolden's guilt or innocence on the charge of second degree murder.
Numerous courts have held, applying the "issues necessarily adjudicated" test that in previous trials on other charges, juries necessarily pass upon the veracity of a defendant in reaching a verdict of acquittal. United States v. Hernandez, 572 F.2d 218 (9th Cir. 1978) (acquittal in first trial on charge of billing the government for more hours spent providing legal services than were actually spent; second trial for perjury); United States v. Nash, 447 F.2d 1382 (4th Cir.1971) (acquitted in first trial on mail theft charge, subsequently charged with perjury on basis of the impossibility of defendant's having obtained *729 money as she testified in first trial); Jay v. State, 15 Ala.App. 255, 73 So. 137 (1916) (holding that further inquiry into falsity of defendant's prior testimony in a rape case is barred); Youngblood v. United States, 266 F. 795 (8th Cir.1920) (where a defendant denies guilt in a previous trial, a subsequent prosecution on a perjury charge is barred); Myers v. State, 57 Md.App. 325, 470 A.2d 355 (Ct.Spec.1984) (acquittal in previous trial on theft charges barred subsequent perjury prosecution where court determined defendant's veracity was necessarily decided by factfinder). Again, could the jury have acquitted Bolden had they found his testimony regarding whether he had contact with Spicer or whether he raped or killed Spicer to be untrue?
This court has previously applied the "same evidence" test when it has been necessary to determine whether double jeopardy has or will attach. State v. Miller, 571 So.2d 603 (La.1990); State v. Knowles, 392 So.2d 651 (La.1980); State v. Solomon, 379 So.2d 1078 (La.1980). Where the same evidence or substantially the same evidence will be used in the second trial, the second prosecution is barred. The majority has accepted the state's contention that it does not intend to base its perjury case solely on the evidence adduced at defendant's trial on the second degree murder charge. However, in argument to this court, the state was unable to set forth the evidence it intends to offer to prove that defendant lied when he testified that he did not kill or rape Brenda Spicer. The only additional evidence the state has indicated it will use is the New Jersey confession. Consequently, any perjury prosecution will be based upon substantially the same evidence and thus it is barred. This is particularly true in view of the evidentiary problems associated with admission of an unsworn statement. See majority opinion note 5.
It cannot be denied that defendant in his New Jersey confession admitted commission of a heinous crime. However, he had been previously acquitted, in Louisiana, by a jury verdict ... guilt or innocence to the contrary notwithstanding!
In my view, the jurisprudence is clearly supportive of a finding favorable to the defendant. The notion of preventing double jeopardy "[l]ike the right to trial by jury, [it] is clearly fundamental to the American scheme of justice." Benton v. Maryland, supra, 395 U.S. at 796, 89 S.Ct. at 2063. We cannot allow society's zeal for punishment to supersede the guarantees contained in our Bill of Rights. One day, the accused may truly be innocent, and bad precedents may sanction the violation of that person's constitutional rights. To allow ourselves to be swayed by the speculation that defendant should at least be put to the inconvenience of a second trial on the same issues decided in the previous trial, does violence to both our state and federal Constitutions.
For these reasons, I respectfully dissent.
LEMMON, Judge, concurring.
The collateral estoppel doctrine, determined in Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970) to be a component of the Fifth Amendment guarantee against double jeopardy, is primarily designed to prevent the state from conducting successive prosecutions against the same defendant for crimes arising out of the same course of conduct. The prosecution of a person for perjury committed in an earlier trial of the same person involves an offense which arises out of a completely separate course of conduct than the underlying offense of which the person was acquitted.
The common law doctrine of collateral estoppel may also rise to constitutional dimensions if the state pursues a perjury prosecution based on testimony by the defendant in a previous criminal proceeding which resulted in an acquittal, when the perjury prosecution is based on the same evidence available at the first trial and represents a mere relitigation of the underlying charge rejected by the first jury on that evidence. The collateral estoppel aspect of double jeopardy may be applied to bar using the same evidence to relitigate an issue decided in an earlier proceeding in which the evidence was material and was necessarily decided by the jury.
There is no constitutional violation, however, when a perjury prosecution is based on *730 evidence that was not available in the first trial. Application of common law collateral estoppel to preclude the subsequent prosecution for perjury is not constitutionally required, and would permit a criminal defendant to secure an acquittal through perjured testimony and then use the unconscionably obtained acquittal as a shield against prosecution for the very perjury that led to the acquittal. No such protection is allowed to any other witness who gives perjured testimony during a trial, and the constitutional guarantee against double jeopardy does not require that protection for a criminal acquittee.
The state in the present case, by showing evidence of defendant's New Jersey confession to the Spicer murder, has presented prima facie proof that defendant committed perjury in the Spicer murder trial. This evidence, which obviously did not exist at the time of the murder trial, establishes that the state is not relitigating the determinative issue in the murder trial merely in hope of a more favorable decision. This evidence further establishes that defendant may well be using an acquittal obtained by perjury to shield himself from prosecution for that perjury. These circumstances, where the state has newly discovered evidence that did not exist at the time of the trial of the underlying offense and that indicates defendant secured his acquittal of the offense through perjury, do not present the evil that constitutional application of collateral estoppel was designed to prevent, and there is no constitutional bar to the perjury prosecution.[1]
NOTES
[*] Charles A. Marvin, Chief Judge, Court of Appeal, Second Circuit, sitting in place of Justice James L. Dennis. Judge Marvin participated in the court of appeal proceedings in this case; therefore, he was recused and Justice Watson became a member of the panel. See Rule IV, Part 2.
[1] Defendant was subsequently indicted in Tennessee for the first degree murder of Joel Tillis. He entered a plea to a reduced charge of involuntary manslaughter and received a sentence of ten years.
[2] La.R.S. 14:123 provides in pertinent part:

Perjury is the intentional making of a false written or oral statement in, or for use in, a judicial proceeding.... In order to constitute perjury the false statement must be made under sanction of an oath or an equivalent affirmation, and must relate to matter material to the issue or question in controversy.
It is a necessary element of the offense that the accused knew the statement to be false; but an unqualified statement of that which one does not know or definitely believe to be true is equivalent to a statement of that which he knows to be false.
[3] 629 So.2d 1155 (La.1993).
[4] Some courts have suggested in dicta that Ashe was only intended to protect defendants from multiple prosecutions for crimes arising out of a single criminal transaction, and was not meant to apply to situations such as perjury committed at the trial of the substantive offense. State v. De Schepper, 304 Minn. 399, 231 N.W.2d 294 (1975); State v. Redinger, 64 N.J. 41, 312 A.2d 129 (1973). There is some support for this position in Ashe itself. 397 U.S. at 446, n. 10, 90 S.Ct. at 1195, n. 10. We agree there is much logic to this position; however, in the absence of more explicit guidance from the Supreme Court, we decline to adopt it here.
[5] We recognize that under our decision in State v. Elsby, 416 So.2d 60 (La.1982), the new evidence (the unsworn statement to police) may be insufficient by itself to convict defendant of perjury. It will be up to the state at trial to produce corroborating evidence to show that defendant's statements to the New Jersey authorities were in fact truthful. Since we do not know what evidence the state plans to rely on in this regard, it would be inappropriate to speculate on its admissibility at this time.
[6] Of course, this new evidence requirement applies only to issues necessarily decided by the jury. When issues have not been necessarily decided by the jury, the courts have allowed perjury prosecutions without a threshold requirement of new evidence. See United States v. Richard, 892 F.2d 761 (9th Cir.1989) (authenticity of trip log not necessarily decided by jury that acquitted defendant of alien smuggling charges); United States v. Baugus, 761 F.2d 506 (8th Cir. 1985) (alibi testimony was not necessarily decided by jury that acquitted defendant of mail fraud); United States v. Giarratano, 622 F.2d 153 (5th Cir.1980) (issue of unauthorized payments to defraud was not necessarily decided at trial for mail fraud, since trial court found proof of mailing was insufficient.)
[1] 4 Blackstone Commentaries 335, quoted in Benton v. Maryland, 395 U.S. 784, 795, 89 S.Ct. 2056, 2063, 23 L.Ed.2d 707 (1969).
[2] Id.
[1] Of course, the state at the perjury trial must prove every element of the offense, and the unsworn New Jersey confession may fall short of meeting that burden. Nevertheless, the issue presently before the court is whether the state can even proceed with the perjury prosecution.