680 So.2d 6 (1996)
STATE of Louisiana
v.
Ivrin BOLDEN, Jr.
No. Cr95-749.
Court of Appeal of Louisiana, Third Circuit.
April 17, 1996.
Writ Denied November 22, 1996.
*9 Jerry L. Jones, Monroe, Charles C. Cook, West Monroe, J. Michael Ruddick, Asst. Dist. Atty., Monroe, for State.
Ansel Martin Stroud, III, Shreveport, for Ivrin Bolden Jr.
Before THIBODEAUX, SAUNDERS and SULLIVAN, JJ.
SULLIVAN, Judge.
This perjury case stems from a murder committed in Monroe, Louisiana on March 5, 1987. Defendant, Ivrin Bolden, Jr., was tried for that murder and acquitted in 1988. During his murder trial, Bolden testified that he neither killed nor had any physical contact with the victim, Brenda Spicer, on the date of her death.
In 1992, the defendant was extradited from Tennessee to the Fourth Judicial District Court in Ouachita Parish. On September 3, 1992, he was charged by bill of information with perjury, a violation of La.R.S. 14:123, in *10 connection with his testimony at the murder trial. The defendant filed pretrial motions, including one for a change of venue, one to suppress his prior statements to New Jersey and Memphis, Tennessee police officials, and another to quash the charge. A hearing was held on these motions on December 14, 1992. On April 26, 1993, the change of venue was granted. The defendant's other motions were denied; the motion to suppress was deferred.
The defendant took supervisory writs on the motion to quash. Both the Second Circuit Court of Appeal and the Louisiana Supreme Court denied his writ applications. State v. Bolden, 93-1933 (La. 7/5/94); 639 So.2d 721. His writ of certiorari to the United States Supreme Court was also denied. Bolden v. Louisiana, ___ U.S. ___, 115 S.Ct. 724, 130 L.Ed.2d 629 (1995).
Pursuant to the motion for change of venue, the matter was transferred to the Ninth Judicial District (Rapides Parish) and assigned docket number 238,403. The Fourth District Judge, Michael S. Ingram, was appointed as a judge ad hoc to the Ninth Judicial District by the Louisiana Supreme Court for the specific purpose of hearing this case.
The motion to suppress was deferred until shortly before trial. On December 30, 1994, the defendant filed a motion for closure of the suppression hearing. The district court heard and denied the closure motion on January 6, 1995. This court and the Louisiana Supreme Court subsequently denied writs.
The defendant filed supplemental motions for closure of the suppression hearing, individual voir dire, suppression of the defendant's statement, and a motion for continuance of the trial; each was denied. Jury selection began on January 17, 1995 and was completed the next day. The trial court then held the motion to suppress hearing. After taking the matter under advisement overnight, the court denied the motion on January 19, 1995. Trial commenced immediately thereafter, and the jury returned a guilty verdict.
A presentence investigation was ordered. The defendant filed motions for new trial and for a post-judgment verdict of acquittal. A hearing on both motions was held prior to the March 10, 1995 sentencing and both were denied. The court then sentenced the defendant to ten years at hard labor, consecutive to any other sentence.[1] The defendant's motion to reconsider sentence and his request for credit for time served were both denied.
He then filed a motion for appeal and to proceed in forma pauperis. These motions were granted. The defendant now appeals his conviction and sentence.

FACTS
The case sub judice stems from a notorious murder in Monroe, Louisiana. The body of Brenda Spicer, a former basketball player at Northeast Louisiana University (NLU), was found in a campus trash dumpster on the morning of March 6, 1987. The coroner determined the victim had been strangled to death at about 7:00 p.m. the previous evening. There was sperm in the victim's rectum and vagina, and saliva on her breasts, but no signs of sexual trauma.
The defendant was tried by jury, and he testified on his own behalf. Bolden specifically denied killing Spicer or having any physical contact with her. The jury returned a verdict of not guilty. For a thorough review of the testimony and facts of the murder trial, see State v. Bolden, 93-1933, 5-8, (La. 7/5/94); 639 So.2d 721, 724-725 (La. 1994).
After the trial, the defendant moved to Tennessee with his girlfriend, Joel Tillis, who had also been a friend and former roommate of Spicer's. In May 1989, Ms. Tillis disappeared, and her body was discovered a month later in Arkansas. Authorities did not charge the defendant with Tillis's murder. He left Tennessee and eventually moved to New Jersey, where he began to live with Jennifer Spurlock. In February 1991, Bolden *11 apparently decided to end the relationship. On March 12, 1991, Ms. Spurlock, who had moved to her mother's home, entered Bolden's apartment without his authorization. Bolden filed a complaint with the local police department, and Spurlock was arrested the next day on burglary charges. On March 14, 1991, the defendant obtained a temporary restraining order against Spurlock. On March 20, 1991, this became a final order prohibiting her from contacting him.
During the police investigation of this episode, Spurlock told New Jersey police that the defendant had stated to her that he murdered both Spicer and Tillis. On March 26, 1991, at the direction of New Jersey officials, she made a recorded telephone call from the police station to Bolden at his work, trying to raise the matter of the murdered women.
On April 23, 1991, the defendant went to the Burlington County, New Jersey prosecutor's office to discuss the Spurlock phone call. After talking for a while, he acceded to investigators' request that he take a polygraph. He signed an examination waiver and a rights form. After investigators told him the test results indicated he was lying, Bolden gave a recorded statement in which he confessed to having killed both Tillis and Spicer.
The defendant was extradited to Tennessee, where he was indicted for the first-degree murder of Tillis. Pursuant to a plea agreement, he entered an Alford plea to involuntary manslaughter and in February 1992 he received the agreed upon sentence of ten years. The State of Louisiana then took action, extraditing the defendant from Tennessee to stand trial on the instant charge of perjury. See Bolden, 93-1933 at 2-4; 639 So.2d at 722.
At the perjury trial, the jury was allowed to listen to a tape of Bolden's April 23, 1991 statement given to officials at the Burlington County, New Jersey prosecutor's office. Captain Robert Scara of that office testified that he met Bolden on that date at approximately 12:25 p.m. Scara handed Bolden a form upon which his Miranda rights were printed. Bolden read the form and then signed it. Captain Scara and Sergeant Fitzpatrick of the prosecutor's office then signed the form. Captain Scara identified state exhibit number one, the rights form signed by Bolden. According to Captain Scara, Bolden had no questions concerning his constitutional rights and said that he understood the contents of the form. After 1:35 p.m., Captain Scara had no further contact with Bolden.
Captain Michael King of the Burlington County, New Jersey Prosecutor's Office testified that he began speaking to Bolden soon after his arrival at the office at approximately 10:30 a.m. on April 23, 1991. At about 12:30 p.m., Bolden was taken to Captain Scara's office where he was given the rights form. At the time, Captain King and Sergeant Tim Cook of the Memphis Police Department were in an adjoining room behind a two-way mirror. They witnessed Bolden sign the rights form and were able to hear his discussion with Captain Scara through a speaker. After Captain Scara advised Bolden of his rights at approximately 12:30 p.m., Bolden was not Mirandized again that day. Captain King took Bolden's recorded statement which began at 3:33 p.m. He conceded that Bolden was not, at any point immediately before or during the statement, advised of his constitutional rights.
Sergeant Cook testified that he witnessed defendant's discussions with Captain Scara from behind the two-way mirror. He stated that Captain Scara advised Bolden of his right to remain silent, that anything said could be used against him in court, and of his right to counsel. Captain Scara then asked Bolden to read the rights form. Sergeant Cook also stated that he was present when Bolden's taped statement was made. He said that Bolden was not threatened, coerced or promised anything in exchange for the statement. According to Sergeant Cook, Bolden did not decline to answer any questions.
A review of Bolden's taped statement reveals that he admitted that, on March 5, 1987, he strangled Spicer at a mini-storage warehouse in Monroe. He then drove her body to the NLU campus and placed it in the trash dumpster.
*12 The state presented the testimony of three witnesses in an effort to corroborate the truthfulness of Bolden's statement given to New Jersey officials. Dr. George McCormick, a forensic pathologist and the Caddo Parish Coroner, testified that he performed the autopsy on Spicer's body. He determined the cause of her death to be manual strangulation. During the course of the autopsy, Dr. McCormick took photographs of Spicer's neck region. In conjunction with his testimony, he identified state's exhibits 10, 12 and 13 as the photographs taken during the autopsy. He explained that the photographs demonstrate physical contact and the aftereffects of strangulation by hand. On cross examination, Dr. McCormick stated that he had testified at Bolden's 1988 murder trial at which he gave the same opinion as to the cause of Spicer's death. Since that trial, he had done no further investigations or examinations in this case.
Rudeen Crawford testified that he owns a gas and service station located across the street from the storage warehouses where the murder was allegedly committed. He identified state's exhibit four, a picture of the warehouse complex taken from his gas station, and exhibit five, a picture of storage unit 103. He stated that, between approximately 5:45 and 6:00 p.m. on March 5, 1987, he saw a tall black man and an average height white woman standing outside storage unit 103. He thought the scene was peculiar because they were standing there and talking for a noticeable period of time instead of going into the storage unit. Crawford stated that the patrons usually get out of their cars, unload or load items, and leave. Thereafter, the man stooped over to unlock and open the warehouse door. According to Crawford, neither person brought anything in or out of the storage unit. He did not see them either walk in or walk out of the storage unit. He left work at about 6:05 p.m. and, as he was leaving, he noticed that the storage unit's roll up door was open approximately 12 to 18 inches from the ground. Crawford concluded that he could not identify the two people whom he saw that day. On cross examination, he stated that he had also testified in Bolden's murder case.
Sergeant Jim Gregory of the Monroe Police Department stated that, in 1987, he was assigned to the crime scene investigation unit. Sergeant Gregory testified that Spicer's body was found inside a trash dumpster on the NLU campus in Monroe. He identified state's exhibit six as a picture of Spicer's body inside the trash dumpster. He also identified state's exhibit seven as a photograph of the area surrounding the trash dumpster. Gregory also stated that he went inside storage unit 103 and obtained dried blood and hair samples from the unit's floor. On cross examination, Sergeant Gregory stated that he also testified at Bolden's prior trial.
After the above testimony was adduced at trial, the defense attempted to call to the stand Dennis Wixted, whom the defense sought to qualify as an expert in criminal law and particularly in the analysis of interrogation techniques employed by New Jersey police. The state objected, claiming that such testimony is prohibited by La.Code Evid. art. 702 because it would concern the ultimate issue, whether Bolden's New Jersey statement was true or false. The trial court ruled that, under Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786, 113 S.Ct. 2786 (1993), Wixted's area was not a recognized field of expertise. Wixted was therefore not allowed to testify, but the defense was allowed to proffer a summary of the substance of Wixted's proposed testimony.
The defense also sought to have a Mr. Wojkieticz, a forensic serology expert, testify about certain procedures that the state could have performed since the first trial. The defense argued that it intended to show that no corroborative work, insofar as the New Jersey statement was concerned, was done after the first trial. The state objected, claiming that the defense was attempting to introduce evidence of the murder that the state itself cannot introduce. According to the state, this would effectively relitigate of the murder which, by law, cannot occur. The court ruled that such testimony would be irrelevant.
As mentioned, Bolden was found guilty and sentenced to ten years at hard labor, the *13 sentence to run consecutive to any sentence previously imposed. He appeals and assigns eighteen errors. Bolden maintains that the district court erred in:
1. Excluding witnesses whom the defendant attempted to call on his behalf, thereby depriving defendant of his right to present a defense;
2. Refusing to allow defendant to introduce the entirety of his testimony given at the earlier murder trial;
3. Denying the motion to suppress defendant's statement given at the Burlington County, New Jersey, Prosecutor's Office on April 23, 1991;
4. Denying defendant's motion for a continuance due to pretrial publicity;
5. Refusing to grant a mistrial after it became evident that the venire had been subjected to prejudicial publicity generated by the news media;
6. Instructing the general venire on specific points of law in the absence of the defendant;
7. Overruling defendant's Batson objections;
8. Refusing to grant defendant's challenges for cause of certain prospective jurors;
9. Allowing the state to show the jury a redacted rights form which was misleading, confused the true issues and was unduly prejudicial;
10. Refusing to grant defendant's motion for a mistrial when the state was allowed to play defendant's taped statement of April 23, 1991, to the jury twice, due to the State's error, thereby unduly prejudicing the defendant by the inherent emphasis on this statement as a result of the replay;
11. Allowing the state to introduce photographs, including autopsy photographs, admitted at the prior trial, as the photographs had nominal, if any, probative value which was substantially outweighed by their prejudicial effect;
12. Instructing to the jury on reasonable doubt;
13. Failing to give defendant's requested jury instructions which sought to instruct the jury that the out-of-court statement, in and of itself, was not sufficient to sustain a conviction for perjury;
14. Failing to give the defendant's requested jury instructions concerning the evidence the jury could properly weigh in determining whether the state sufficiently corroborated the out-of-court statement;
15. Overruling defendant's request for a mistrial after the prosecutor's impermissible comment, made in rebuttal, upon the defendant's failure to present any defense;
16. Admitting testimony given at the initial trial, thereby subjecting defendant to a trial in violation of both the double jeopardy clause and the collateral estoppel component of said clause;
17. Denying defendant's motion for post judgment verdict of acquittal;
18. Imposing the maximum sentence, and its failure to accord defendant credit for time served.

ASSIGNMENT OF ERROR NO. 17
In this assignment, the defendant alleges the lower court erred by denying his motion for a post judgment verdict of acquittal. His basis for this assignment is that the evidence was insufficient to have supported the conviction. Because defendant raises the insufficiency of the evidence, we will address this assignment first. State v. Hearold, 603 So.2d 731 (La.1992).
When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 rehearing denied, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); State ex rel. Graffagnino v. King, 436 So.2d 559 (La.1983); State v. Duncan, 420 *14 So.2d 1105 (La.1982); State v. Moody, 393 So.2d 1212 (La.1981). It is the role of the factfinder to weigh the respective credibilities of the witnesses, and therefore the appellate court should not second-guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. See State ex rel. Graffagnino, 436 So.2d 559, citing State v. Richardson, 425 So.2d 1228 (La.1983).
In order for the state to obtain a conviction, it must prove the elements of the crime beyond a reasonable doubt. The Jackson standard has been codified at La.Code Crim.P. art. 821 as the standard for post verdict judgments of acquittal.
The perjury statute, La.R.S. 14:123, states, in pertinent part:
Perjury is the intentional making of a false written or oral statement in, or for use in, a judicial proceeding, or any proceeding before a board or official, wherein such board or official is authorized to take testimony. In order to constitute perjury the false statement must be made under sanction of an oath or an equivalent affirmation, and must relate to matter material to the issue or question in controversy.
It is a necessary element of the offense that the accused knew the statement to be false; but an unqualified statement of that which one does not know or definitely believe to be true is equivalent to a statement of that which he knows to be false.
A review of the defendant's argument reveals it is not based so much upon insufficiency arguments as upon the collateral estoppel doctrine. The defendant argues an error occurred which invalidates a portion of the state's evidence. The defense contends that, because of this alleged error, the overall evidence is insufficient. This is not the proper subject of a Jackson review. In Hearold, 603 So.2d at 734, the supreme court explained the requirement that assignments of error arguing insufficiency be discussed before other errors:
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accordance with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) in the light most favorable to the prosecution, could not reasonably conclude that all of the essential elements of the offense have been proved beyond a reasonable doubt. When the entirety of the evidence, including inadmissible evidence which was erroneously admitted, is insufficient to support the conviction, the accused must be discharged as to that crime, and any discussion by the court of the trial error issues as to that crime would be pure dicta since those issues are moot.
On the other hand, when the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the accused is not entitled to an acquittal, and the reviewing court must then consider the assignments of trial error to determine whether the accused is entitled to a new trial. If the reviewing court determines there has been trial error (which was not harmless) in cases in which the entirety of the evidence was sufficient to support the conviction, then the accused must receive a new trial, but is not entitled to an acquittal even though the admissible evidence, considered alone, was insufficient. Lockhart v. Nelson, 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988).
Bolden's arguments regarding collateral estoppel form the core of his brief. We will address such arguments under the appropriate assignments of error; however, it is clear from the law cited above that the collateral estoppel issue is not properly addressed in an insufficiency of evidence review.
Properly considered, the evidence in the case sub judice was sufficient. Clearly, Bolden's 1988 testimony in the Spicer murder trial and his 1991 confession to New Jersey police could not both have been true: Bolden had to have known both were not true, as the statements are diametrically opposed. Under the perjury statute, prosecutors *15 in the present case had to prove the defendant's sworn testimony in the 1988 trial was the false statement. Thus, to corroborate the 1991 confession as the true statement, the state produced witnesses and physical evidence from the first trial to support the confession.
While explaining the elements of the crime to the jury, the trial court incorporated the defendant's allegedly false statement therein, to wit:
QUESTION: Did you meet Brenda Spicer at the storage locker on March 5th?
ANSWER: No, I did not at any time that day.
QUESTION: The only time you saw Brenda Spicer was when she gave you that camera and the five dollars?
ANSWER: I saw her earlier in the dorm, and the last time I saw her was at the intersection when she had given me the camera.
QUESTION: Did you have any kind of physical struggle or contact with Brenda Spicer that day?
ANSWER: No, I didn't have any contact with her at all physically.
QUESTION: Did you kill Brenda Spicer on March the 5th?
ANSWER: No, I did not.
In his confession, the defendant specifically said he met Spicer at his storage unit and talked with her before strangling her.
Jurors in the instant case heard from Dr. George McCormick, a forensic pathologist and coroner, and from Sergeant Jim Gregory of the Monroe Police Department, an investigator in the Spicer murder. These witnesses testified to such matters as cause of death and the manner of the disposal of the victim's corpse. This testimony included identification of photographs which were also used in the 1988 murder trial. Gas station proprietor Rudeen Cranford also testified; he had seen a tall black male with a white female unlocking Bolden's storage unit early on the evening of the murder. This evidence supported details from the 1991 confession: that Bolden met Spicer at a mini-storage warehouse, strangled her there, and later disposed of her corpse in an on-campus dumpster. The evidence was clearly sufficient to support the conviction, in light of Bolden's confession which was, in substance, factually opposite of his 1988 trial testimony.

ASSIGNMENT OF ERROR NO. 16
By this assignment, the defendant argues the lower court erred by admitting testimony that was given in the 1988 murder trial, alleging the admission of such testimony violates double jeopardy protections, including the principle of collateral estoppel. We address this assignment out of order because the collateral estoppel issue forms the crux of the defendant's appeal.
This assignment presents a thicket of intertwined legal and factual issues. Two main problems result from the application of collateral estoppel to the particular facts of this case. The first problem is that the subsequent crime charged in this case is perjury, and the second problem is that the defendant being prosecuted for perjury is the same defendant who benefited from the perjured testimony. To strictly apply collateral estoppel in a perjury trial would result in no evidence of the first trial being admissible and would make it virtually impossible to convict a defendant of perjury based upon his testimony in an earlier trial where he was also the defendant. However, to deem admissible all evidence of the prior crime would effectually eliminate the collateral estoppel doctrine in any perjury trial and could result in a defendant being convicted of perjury because he is a person of bad character. Thus, this court must reach a middle ground where the defendant's constitutional protection from retrial based upon the same set of facts is balanced with the state's right to punish someone for lying under oath about a material fact. The supreme court touched on this issue in State v. Bolden, 93-1933 (La. 7/15/94); 639 So.2d 721, and apparently concluded that some evidence of the murder may be admissible but the state could not "relitigate the murder." Thus, the issue in this assignment of error turns on what "relitigate the murder" means, or, more specifically, what the supreme court meant by the phrase.
*16 The controlling law for the case sub judice is provided by the Louisiana Supreme Court's recent decision which allowed this trial to go forward.[2]State v. Bolden, 639 So.2d 721. The high court reviewed the record from the original murder trial and made the following analysis of the facts in light of well-established jurisprudence. Because of the importance of this issue, we quote extensively from the high court's discussion:
Having reviewed the record, we find that the jury decided that the state failed to prove beyond a reasonable doubt that defendant murdered Brenda Spicer. Clearly, the doctrine of collateral estoppel bars the state from relitigating the issue of whether defendant murdered Spicer. (Emphasis added.) However, it is arguable whether the jury necessarily decided the issue of whether defendant was telling the truth when he testified under oath that he did not kill Brenda Spicer or have physical contact with her. This was not a situation where the jury was presented with two conflicting versions of the facts and forced to determine the veracity of one over the other. Cf. United States v. Sarno, 596 F.2d 404 (9th Cir.1979); Commonwealth v. Hude, 492 Pa. 600, 425 A.2d 313, 321 (1980). The state presented no eyewitness testimony contradicting defendant's assertions that he did not kill Spicer or have physical contact with her. Rather, the state's case was based on circumstantial evidence showing that defendant had the motive and opportunity to kill Spicer.

* * * * * *
The major factor that distinguishes this case from all other reported cases we have examined is that in this case, the state has obtained new evidence not available to it during the original trial that defendant testified falsely under oath. Several cases have suggested in dicta that when the state produces new and additional evidence that defendant lied under oath at his first trial sufficient to permit the trier of fact to conclude beyond a reasonable doubt that perjury has been committed, the doctrine of collateral estoppel does not bar a prosecution for perjury. United States v. Nash, 447 F.2d 1382 (4th Cir.1971) (Winter, J. concurring); Kuskulis v. United States, 37 F.2d 241 (10th Cir.1929) (Winter, J., concurring); Allen v. United States, 194 F. 664 (4th Cir.1912); see also, Note, Perjury by Defendants: The Uses of Double Jeopardy and Collateral Estoppel, 74 Harv. L.Rev. 752, 763 (1961).
We believe that such a rule comports with the fundamental policy considerations behind the doctrine of collateral estoppel when applied in the context of perjury. On the one hand, there is a concern that allowing an acquittal to insulate the defendant from perjury will give a defendant "an uncontrollable license to testify falsely," with a resulting detriment to the reliability of evidence. On the other hand, there is an apprehension that allowing a prosecution for perjury will give the state a "second shot" at defendant for the same wrong, or allow an overzealous prosecutor to use the perjury trial to retry issues already determined in defendant's favor. Adams v. United States, 287 F.2d 701, 703 (5th Cir.1961); Commonwealth v. Hude, 492 Pa. 600, 425 A.2d 313, 318 (1980). The concern that the state should not be given a second chance based on the same evidence was central to the Court's holding in Ashe [v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970)].
The court added the following in footnote number five:
We recognize that under our decision in State v. Elsby, 416 So.2d 60 (La.1982), the new evidence (the unsworn statement to police) may be insufficient by itself to convict *17 defendant of perjury. It will be up to the state at trial to produce corroborating evidence to show that defendant's statements to the New Jersey authorities were in fact truthful. Since we do not know what evidence the state plans to rely on in this regard, it would be inappropriate to speculate on its admissibility at this time.
Bolden, 639 So.2d at 725-726. (Emphasis added in quoted footnote.)
The Bolden court refused to quash the information or delete any language from the phrase "had physical contact with and/or killed Brenda Spicer." Additionally, the footnote mentioned above clearly contemplates that corroborating evidence would be admissible at the perjury trial. As no part of the indictment was quashed, the high court must also have contemplated that some evidence of Spicer's murder would be introduced to corroborate Bolden's April 23, 1991 statement.
The state's case in the perjury trial included some evidence of the murder that had been introduced in Bolden's original trial. In presenting such evidence, the state was apparently relying on the supreme court's statement in footnote number five that it had the burden of producing corroborative evidence of the truthfulness of Bolden's April 23, 1991 extra-judicial statement. The defense argues that the use of the testimony of Dr. McCormick and Sergeant Gregory, along with the autopsy and crime scene pictures, in effect amounted to a relitigation of the murder. The state counters that such evidence was necessary to corroborate the specifics of Bolden's April 23, 1991 statement. The pertinent substance of that statement is as follows:
Q. What were the circumstances surrounding the death of Ms. Spicer?
A. I went, um, I asked her come to like, we had a storage unit, and I asked her to come there with me and then I was trying to talk to her, you know, I had been asking her and asking her to, you know, try to give me some time with Joel and she just, you know, she just kept saying that she was going to be with Joel no matter what, and so I just, I got mad with her and I strangled her.
Q. And where did this take place at, the storage area?
A. Yeah.
Q. And where was the storage area located?
A. Not far from the college campus in Monroe, Louisiana.
Q. And after you strangled her, what did you do?
A. Took her body back to the campus and put it in the dumpster and went back to the game or I went back to the dorm or something.
The facts and procedural history of the present case highlight the difficulty in distinguishing an attempt to reprosecute from a "true" perjury case. They also demonstrate the quandary with which the state was faced: to either (1) present corroborative evidence from the first trial to prove the subsequent extra-judicial statement is true (and thus that Bolden perjured himself) and, if too much corroborative evidence is presented, run afoul of the collateral estoppel doctrine or (2) present very little or no corroborative evidence of the statement and run the risk of having Bolden acquitted of perjury. As a factual matter, the perjury and the Spicer murder, for which Bolden has been acquitted, are fundamentally intertwined.
Although the testimony of Dr. McCormick and Sergeant Gregory and the pictures introduced directly relate to the previously litigated murder issue, giving the appearance of a relitigation of the original charge, we cannot merely conclude that such a relitigation occurred without first examining the specific facts of the case. As the United States Supreme Court pointed out in Ashe, 397 U.S. at 444, 90 S.Ct. at 1194:
The federal decisions have made clear that the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality. Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to "examine the *18 record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." The inquiry "must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." Sealfon v. United States, 332 U.S. 575, 579, 68 S.Ct. 237, 240 [92 L.Ed. 180]. Any test more technically restrictive would, of course, simply amount to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where the first judgment was based upon a general verdict of acquittal.
Operating on this case-specific factual inquiry principle, both the federal jurisprudence and that of other states reveal no uniform rule for cases such as the present one. Some cases have excluded all evidence of the prior felony from the perjury trial, limiting the prosecution to an attack of the alibi testimony. In Zolun v. State, 169 Ga. App. 707, 314 S.E.2d 672, 673-74 (1984), which, like the present case was a perjury trial following a murder acquittal, the court reasoned as follows:
When scrutinized, the seemingly incongruous decisions involving this issue merely reflect the unique factual context of each case. One frequently recurring situation involves a perjury prosecution following the defendant's trial and acquittal on another charge. If the particular testimony alleged to be false is as general and as broad as the charge of the crime, such as a general denial of guilty, an indictment for perjury is precluded by the jury's verdict of acquittal. Ehrlich v. United States, 145 F.2d 693 (5th Cir.1944); Youngblood v. United States, 266 F. 795 (8th Cir.1920); Chitwood v. United States, 178 F. 442 (8th Cir.1910). Thus, it has been held that following an acquittal of an adultery charge, the defendant could not be tried for perjury based upon his denial of engaging in sexual relations. Cooper v. Commonwealth, 106 Ky. 909, 51 S.W. 789 [(1899)]. But an acquittal does not generally bar a perjury prosecution based upon a defendant's alibi assertion, since a jury may disbelieve his alibi testimony and still decline to convict him. Adams v. United States, 287 F.2d 701 (5th Cir.1961). "[T]he doctrine of collateral estoppel does not bar the perjury prosecution unless the issues of fact central to that prosecution were necessarily determined in the former trial. [Cits.] Unless the record of the prior proceeding affirmatively demonstrates that an issue involved in the second trial was definitely determined in the former trial (emphasis added), the possibility that it may have been does not prevent the relitigation of that issue. [Cit.]" United States v. Haines, 485 F.2d 564 (7th Cir.1973). State v. Tate, 136 Ga.App. 181, 185-6, 220 S.E.2d 741 (footnote omitted).
The Bolden court intended to allow the state, at the perjury trial, to present more evidence than only that which would attack the alibi testimony because it did not quash the murder-related language from the bill of information. As the Louisiana Supreme Court noted, it is arguable as to whether the jury in the murder case definitely or necessarily determined the issue of whether Bolden told the truth when he stated under oath that he did not kill or have any physical contact with Spicer. The jury could reasonably have acquitted Bolden on a determination that the state failed to prove Bolden murdered Spicer beyond a reasonable doubt, without deciding or even reaching the issue of Bolden's veracity.
After reviewing the evidence presented in Bolden's murder trial in comparison to the evidence presented in the perjury trial, we conclude that, under the particular facts of this case, the state did not violate the doctrine of collateral estoppel by presenting the murder-related testimony and pictures. It is clear that, in the perjury trial, the state was careful to limit the evidence only to that which specifically corroborated Bolden's April 23, 1991 statement to New Jersey officials. In his statement, Bolden said he strangled Spicer at the storage warehouse then took her body back to the campus and put it in a dumpster. Dr. McCormick's testimony and the autopsy pictures corroborated that physical contact occurred and that manual strangulation was the cause of death. *19 Sergeant Gregory's testimony and the crime scene photographs corroborated Bolden's statement that he placed Spicer's body in a dumpster on the NLU campus. The state clearly did not "relitigate the murder," as a large amount of the evidence and testimony from the murder trial was not used to prove the perjury offense. The state sufficiently limited the scope of its presentation of proof to only the evidence which tended specifically to corroborate the new evidence, the unsworn statement to New Jersey officials.
The state sought to prove that Bolden committed perjury by showing that this subsequent statement was truthful. In so doing, as noted by the supreme court in Bolden, 639 So.2d at 726, n. 5, it had to "... produce corroborating evidence to show that defendant's statements to the New Jersey authorities were in fact truthful." The state was successful in doing so without violating the doctrine of collateral estoppel. For these reasons, this assignment of error lacks merit.

ASSIGNMENT OF ERROR NO. 1
By this assignment, the defendant argues the trial court prevented him from putting on a case by not admitting the testimony of the only two witnesses the defendant planned to call, Dennis Wixted, a law enforcement interrogation expert, and a Mr. Wojkieticz, a forensic serology expert.
After the evidence was closed and the jury retired to deliberate, defense counsel made a proffer on the record, giving a summary of how Wixted and Wojkieticz would have testified. During argument regarding these witnesses, defense counsel relied on La.Code Evid. art. 702, and he also argued, as he does on appeal, that his client's constitutional right to put on a case was violated. A motion to suppress defendant's statement to the New Jersey police was held on the morning of trial, but Wixted was not called by the defense to testify at this pretrial hearing.
Clearly, a defendant has a right to put on a defense, under La. Const. art. I, sec. 16. See also State v. Hamilton, 441 So.2d 1192 (La. 1983). The strength of this right was recently demonstrated in State v. Van Winkle, 94-0947 (La. 6/30/95); 658 So.2d 198, in which the court stated that evidentiary rules may not supersede the fundamental right to present a defense. The Van Winkle court's discussion focused on the use of hearsay, and the rule that a defendant may always assert that a third party committed the crime. The high court then held the defendant should have been allowed to delve into a witness's homosexual background, where there was evidence of a homosexual assault upon the victim. The present case is distinguishable because it does not involve hearsay or evidence implicating a third party.
The standard of review for the trial court's decisions on admissibility is abuse of discretion. State v. Guidry, 94-678 (La.App. 3 Cir. 12/7/94); 647 So.2d 502. As to Wixted's testimony, it is not clear what he would have contributed to the jury's understanding, as per La.Code Evid. art. 702.[3] Defense counsel elected to summarize the gist of what Wixted's testimony would have been, rather than put the witness on the stand (out of the jury's presence) for proffer purposes. Thus, the record contains no more detail about Wixted's testimony than that already given. Any information elicited from Wixted would have gone solely to the weight of the statement the defendant gave to New Jersey authorities.
The defendant cross examined officers about the circumstances of the interrogation, and was able to develop relevant facts concerning the interrogation before the jury in that manner. On appeal, the defendant argues that the information elicited by his cross examination merely laid the foundation for the testimony he intended to introduce in his case-in-chief.
Our primary difficulty in analyzing this assignment stems from the paucity of facts in the defendant's proffer. Clearly, he was given a full opportunity to make his proffer for the record and chose to summarize the potential testimony of Wixted.
*20 The defense made no attempt to use Wixted's testimony at the motion to suppress hearing held the morning of the trial. Once that motion had been heard, the issue of whether Bolden's statement was free and voluntary had been decided as to admissibility. In his cross examinations of the various officers involved, the defense counsel repeatedly questioned the procedures used that ultimately resulted in defendant's statement. In the case sub judice, his obvious goal was to attack the weight of that statement by casting doubt on its veracity. Under the facts adduced, either Bolden's statement was untrue or his testimony in his murder trial was untrue. Thus, Wixted's testimony would have had to involve whether the police procedures somehow coerced or pressured the defendant into making an untrue statement.
At trial, there was no issue remaining as to whether the statement was free and voluntary; all that was left was the truthfulness of the statement, i.e., a question of weight. Wixted could not have offered an expert opinion concerning the truthfulness of defendant's statement because an expert witness may not testify as to the ultimate issue of the case. Through careful questioning, the ultimate issue regarding truthfulness could have been avoided, but then Wixted's testimony would have been so narrowly focused on the issue of the particular procedures involved as to be merely cumulative of the facts adduced under cross examination of the various officers. Also, the issue was not so technical that expert testimony was necessary to assist the jury. There is no evidence in the record of technical facts related to police procedure that the jurors could not have understood on their own based on answers elicited during cross examination of officers by defense counsel. Thus, under the few facts available, the Wixted testimony was not relevant.
As to the second defense witness, Wojkieticz, his testimony would have been inappropriate. In effect, he was to testify as to what the state could have or should have done with scientific evidence (i.e., blood samples and semen samples) for the initial murder trial. Such defense speculation has no relevance because the settled rule is that the state decides for itself how to make out its case, including what evidence to use. State v. Green, 94-986 (La.App. 3 Cir. 3/1/95); 651 So.2d 435. Additionally, it is not clear from the proffer whether the blood and semen evidence was even relevant to the perjury charge. No blood or semen evidence was introduced in this trial. Therefore, the lower court properly excluded Wojkieticz's testimony.
For the reasons discussed, this assignment is without merit.

ASSIGNMENT OF ERROR NO. 2
By this assignment, the defendant argues the trial court erred in refusing to introduce the entirety of his testimony given at the earlier murder trial. The state introduced as S-2 only those statements it alleged were false. The defendant argues the entire testimony should have been introduced under La.R.S. 15:450, which states:
Every confession, admission or declaration sought to be used against any one must be used in its entirety, so that the person to be affected thereby may have the benefit of any exculpation or explanation that the whole statement may afford.
Counsel argued immediately prior to trial as to how much of the testimony should be admitted. The district court ruled in the state's favor, admitting only that portion of the prior testimony for which the state intended to prove Bolden lied. A transcript of Bolden's entire murder trial testimony was accepted as a proffer. The defense's argument is based on the statute and on State v. Hennigan, 404 So.2d 222 (La.1981), in which La.R.S. 15:450 was cited in allowing the state to introduce the entirety of prior grand jury testimony over defense objections.
The state counters that the Louisiana Supreme Court's recent decision in this case as to double jeopardy and collateral estoppel prevented any use of other information as to the murder of Brenda Spicer. The state also implies that Bolden's testimony which was excluded was irrelevant to the perjury issue. Additionally, the state contends the passage of the Louisiana Code of Evidence has rendered Hennigan and apparently La.R.S. 15:450 inapplicable because La.R.S. 15:450 *21 was meant to deal with pre-Code of Evidence hearsay problems.
The prosecution's argument concerning the present viability of La.R.S. 15:450 was rejected in State v. Bourque, 622 So.2d 198 (La.1993). While not precisely on point, Bourque reaffirmed that La.R.S. 15:450 gives the defendant a statutory right to insist on introduction of the entirety of a statement sought to be used against him. Additionally, regardless of any changes that may have taken place in the law of evidence since the Hennigan decision, the caselaw is clear that La.R.S. 15:450 exists to protect defendants.
Under the wording of the statute, the defendant had a right to have his entire previous testimony admitted. While more details concerning the Spicer murder would have arisen, this may or may not have caused further collateral estoppel problems. The excerpts that were admitted into evidence were those in which Bolden specifically denied killing Spicer or having any physical contact with her, thus involving the ultimate issue of the original murder trial. The excluded portion, containing information tangential to the perjury issue, may have resulted in the prohibited relitigation of the murder.
In State v. Haynes, 291 So.2d 771, 773 (La.1974), appeal after remand, 339 So.2d 328 (1976), the high court said:
The deliberate attempt to use an excerpt from, rather than the entirety of, the defendant's prior admission or confession, in violation of La.R.S. 15:450 is reversible error. It is not harmless, aside from its initial unfairness, because it constitutes a substantial violation of a statutory right of the accused. La.Code Crim.P. art. 921.
However, this case also acknowledged in its discussion that the rule would not require the introduction of irrelevant or incompetent evidence. Id.
In attempting to exclude all but the allegedly perjured testimony, the state obviously was being cautious in light of the supreme court's recent decision regarding double jeopardy and collateral estoppel in this case. The state wished to avoid violating Bolden's rights as to double jeopardy, and thus had to avoid relitigating the murder. The defense proffer contains the defendant's full testimony from the original trial, some 114 pages. Inevitably, use of this testimony involves key details of the murder trial. The prosecution's reluctance to introduce the full transcript is well-founded, especially because the Bolden court left collateral estoppel issues partially unresolved, as the high court had no way of knowing exactly what evidence would be used when the matter came to trial. Bolden, 639 So.2d at 726, n. 5.
Thus, the state had to avoid double jeopardy/collateral estoppel problems, and introducing the full transcript would have created such problems. The Haynes decision implied that the rule of fairness codified in La.R.S. 15:450 could be overridden by the basic evidentiary balance of relevance versus prejudice. Haynes, 291 So.2d at 773. Also, despite Haynes, La.R.S. 15:450 is not an absolute. For example, it must defer to the rule against other crimes evidence (a defendant may have such evidence excised, but may not exclude the entire prior statement), and it may also be waived through lack of a contemporaneous objection. State v. Stanfield, 562 So.2d 969 (La.App. 3 Cir.), writ denied, 567 So.2d 609 (La.1990). Introducing all of Bolden's prior testimony, which detailed his actions on the day of Spicer's murder, may have involved "relitigating the murder." Thus, even the statutory right in La. R.S. 15:450 must give way to the constitutional right against double jeopardy. If La. R.S. 15:450 and Haynes were to be strictly applied in this case, the defendant would be able to force the state to violate his greater, constitutional rights, and defendants like Bolden would essentially be able to insulate themselves from perjury prosecutions. We conclude that such a legally absurd result is not intended to result from the application of La.R.S. 15:450 and the Haynes case. The trial court did not err in admitting only the portion of Bolden's prior testimony that was relevant to the perjury charge.
For the reasons discussed, this assignment is without merit.

ASSIGNMENT OF ERROR NO. 3
Under this assignment, the defendant contends the trial court erred in its denial of *22 his motion to suppress the statement he gave to authorities in Burlington County, New Jersey. As he did before the lower court, defendant alleges this statement was obtained pursuant to an illegal arrest and custodial interrogation in violation of his rights under U.S. Constitution amendments 4 and 14 and Louisiana Constitution article I, sec. 13. The defendant claims his statement was not freely and voluntarily given and was made without proper advice of rights, violating U.S. Constitution amendments 5, 6, and 14, and Louisiana Constitution article I. Finally, defendant argues that his statement was influenced by promises and inducements, in violation of La.R.S. 15:451.
In his brief, the defendant asserts the following factual bases for this assignment:
1. The Memphis Police Department was aware that the defendant was represented by counsel with respect to the investigation of Joel Tillis' disappearance and death.
2. The Burlington County Prosecutor's Office initiated the telephone call from Jennifer Spurlock to the defendant at his place of employment on March 26, 1991, in violation of the restraining order.
3. The defendant reported the violation of the restraining order and was asked by investigators of the Burlington County Prosecutor's Office to give a statement regarding his complaint against Ms. Spurlock on March 27, 1991.
4. In March, 1991, Sergeant Tim Cook of the Memphis Police Department received a phone call regarding Ms. Spurlock and Mr. Bolden. He subsequently went to New Jersey to further investigate her information (Spurlock's) regarding the Joel Tillis homicide.
5. The day after Cook arrived in New Jersey, the defendant was asked to come to the Burlington County Prosecutor's Office to give another statement regarding the extortion phone call.
6. While Mr. Bolden was there, Detectives King and Fitzpatrick requested that he take a polygraph examination regarding this phone call.
7. The defendant was shown the "Polygraph Examination Rights Waiver and Release Form" by Detective Scara. Scara did not read the form to the defendant, nor did he orally advise him of his rights.
8. The rights form related only to the extortion phone call and interviews by Robert Scara. The form also did not advise there would be any additional interviews or questioning on other matters by other investigators.
9. Defendant was never readvised of his rights by any investigators after the polygraph examination indicated deception and before further questioning began.
10. The defendant was never clearly told that he could leave, and, most likely, he would have been prohibited from doing so after the polygraph examination.
11. Despite defendant's request to contact counsel, he was not allowed to do so until after his inculpatory statements were recorded.
The state counters by noting that, at the motion to suppress hearing, Bolden acknowledged that he read a rights form before he took the polygraph, and that he understood his rights. Defendant contended he made the inculpatory statement because of promises made by Detective Michael King of New Jersey. Bolden also claimed the officials rehearsed the statement with him and he was told what to say by the authorities. He alleged that, in exchange for the confession, Captain King promised that he would arrange a deal that he would not have to serve jail time. Captain King and another officer present, Sergeant Cook of Memphis, denied that any promises or inducements had been made. When questioned specifically about the officers' answers, Bolden reasserted his claim that promises had been made to him to obtain his statement.
The district court sits as the factfinder in motions to suppress; thus, credibility was firmly within its discretion. State v. Hebert, *23 559 So.2d 821 (La.App. 3 Cir.), writ denied, 563 So.2d 865 (La.1990). Apparently, the lower court found Bolden less credible on the issue of inducements than the detectives who testified.
Likewise, Bolden's testimony that he understood his rights provides a firm basis for the lower court's finding that the statement was given freely and voluntarily. See, e.g., State v. Carter, 569 So.2d 1025 (La.App. 3 Cir.1990), writ denied, 575 So.2d 389 (La. 1991). Additionally, this court has not required police to re-advise suspects of their rights, absent a "significant break in the interrogation process." State v. Bordelon, 597 So.2d 147, 151 (La.App. 3 Cir.), writ denied, 600 So.2d 678 (La.1992). As a factual matter, the defendant's rights were fully protected because he was advised of them and he understood them. As both sides have acknowledged since the 1988 murder trial, the defendant is a highly intelligent, highly educated individual.
The defendant does not squarely address the presence of counsel issue on appeal. However, the state does thoroughly discuss the issue of whether Bolden was in fact represented by counsel at the time he gave the April 23, 1991 statement.
Although the defendant claims his Sixth Amendment rights were violated, citing Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1978) and Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), he does not pursue an argument made at trial, and that the state elected to address in this appeal. At trial, the defense argued that when Bolden gave his statement, he was still under the representation of counsel previously retained in Louisiana and Tennessee, for the Joel Tillis murder. The defendant notes such alleged representation as a "fact" in brief, but fails to make an argument supporting the assertion.
As the lower court stated:
At the time Mr. Bolden left the State of Tennessee, he was not a suspect, he was not in custody; the Memphis police had no clues as to the whereabouts of Joel Tillis or that she had been a victim of a homicide.
For almost two years after his departure from the State of Tennessee, nothing happened. The evidence in the form of certain documents and exhibits, which were introduced into evidence and which were read and reviewed by the Court during the overnight recess, reflect that Mr. Bolden had some different residences, one in Florida after he returned home in 1989 to Shreveport.
Ultimately, he wound up residing in the State of New Jersey, and I'm not going to try to pronounce those names, but they're in the recordthose towns in New Jerseybut anyway, at some point in time during late 1990 or early 1991, he and Miss Spurlock began living together.
The evidence suggests that Mr. Bolden desired to terminate that relationship on a friendly basis, that Miss Spurlock was upset by the termination, particularly in view of the fact that the defendant had found a new girlfriend.
Anyway, whetherand that ultimately led to the defendant obtaining a protective order against Ms. Spurlock, and then ultimately going to the New Jersey authorities to seek enforcement of that protective order.
And on the day in question, he signed S-1 in which he basically waived the traditional and fundamental constitutional rights concerning the giving of statements to the police.
In dealing with the first issueand I'm almost to the second issuethe facts are the question is whether thewhether his representation by Mr. Durand in Memphis extended the almost two years later.
* * * * * *
In the Court's opinion, the right of representation, or the fact of representation under the factual situation presented in this case, does not extend almost for a period of almost two years and not even anything coming closer to that.
So, for that reason or those reasons, the motion to suppress the statement is denied.
The state relies on State in the Interest of Wells, 532 So.2d 191 (La.App. 3 Cir.1988). *24 In that case, the defendant was questioned by police in February, requested counsel, and the questioning was terminated. In March, he was questioned again and confessed. Citing Edwards, Wells maintained that the second interrogation, after a month with no charges pending against him, was a police-initiated custodial interrogation. Wells claimed his earlier-invoked (in February) right to counsel had been infringed by the March interrogation, and that his confession was thus inadmissible. The trial court denied his motion to suppress, and he sought relief in this court.
This court held Edwards did not apply to the facts, stating:
Where a suspect is released from custody and is not interrogated again for a period of time, such as over one month in the case at bar, there is not a reasonable possibility of wearing down the suspect to the point that the suspect would waive his previously invoked right to counsel.
In the absence of application of Edwards, the Louisiana jurisprudence still requires that the suspect's asserted right to counsel be "scrupulously honored." State v. Salgado, 473 So.2d 84 (La.App. 5 Cir.1985), writ den., 478 So.2d 1233 (La. 1985); State v. Harper, 430 So.2d 627 (La. 1983); State v. Thucos, 390 So.2d 1281 (La.1980); State v. Manning, 380 So.2d 46 (La.1980). The factors to be considered in determining whether the request for counsel was scrupulously honored are:
(1) who initiates the further questioning; (2) the time delay between the original request and subsequent interrogation; (3) whether Miranda warnings were given before each interrogation; (4) whether waiver of rights forms were signed; and (5) whether or not pressures were asserted on the accused by the police between the time he invoked his right to counsel and the subsequent interrogation. State v. Harper, supra; State v. Shea, 421 So.2d 200 at 209 (La.1982), [rev'd 470 U.S. 51, 105 S.Ct. 1065, 84 L.Ed.2d 38 (1985), rev'd on remand, 466 So.2d 449 (La.1985)]; State v. McCarty, 421 So.2d 213 (La.1982). (Emphasis added.) State v. Salgado, 473 So.2d 84, at page 89 (La.App. 5 Cir.1985); writ den., 478 So.2d 1233 (La.1985).
Wells, 532 So.2d at 196.
The court went on to say:
A request for counsel followed by a termination of interrogation, a release from custody, and then a substantial period out of police custody, should not operate as a permanent bar to all further police-initiated interrogation.
Id.
In light of the finding of the Wells court as to a one-month time lapse between interrogations, the trial court was correct in finding personal legal representation did not extend for a two-year period. While Bolden had retained various counsel in the Spicer and Tillis matters, the defense did not establish that the defendant made such retention ongoing. The record reveals that, just before leaving Memphis in 1989, Bolden retained Kemper Durand as counsel. Durand then notified Memphis Police of the representation and of the fact that all future contact with Bolden was to be done through Durand. This phone call apparently was the only action taken by Durand on behalf of Bolden. Also, Bolden did not ask New Jersey authorities to allow him to speak to counsel at any time before confessing to the Spicer murder.
Although the defendant cites a factually similar case, United States v. Gillyard, 726 F.2d 1426 (9th Cir.1984), this is a federal circuit case, not binding upon this court. Defendant Gillyard agreed to take a polygraph and signed a rights form before taking the examination. The results indicated he was lying, and he was questioned at length by investigators other than those who administered the polygraph. After denying involvement several times, Gillyard finally confessed. Both the federal district court and the Ninth Circuit applied the "totality of the circumstances" test from Wyrick v. Fields, 459 U.S. 42, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982), cert. denied after remand, 464 U.S. 1020, 104 S.Ct. 556, 78 L.Ed.2d 728 (1983), and decided Gillyard should have received a second set of warnings. The federal circuit, however, did not fully explain how it applied the test to the facts before it. Additionally, *25 the Gillyard decision was based on a "clear error" analysis of the decision already made by the federal district court. As the Gillyard court itself observed, "[T]he district court might have determined under the totality of the circumstances the defendant had properly waived his Miranda rights." Gillyard, 726 F.2d at 1429.
However, even under Gillyard's "totality of the circumstances" approach, we find that the New Jersey authorities did not need to Mirandize Bolden a second time. The defendant is an intelligent, highly educated individual who testified he was advised of, and understood, his constitutional rights. He did not ask to speak to counsel, nor did he even indicate he was represented before making his confession. This assignment is without merit.

ASSIGNMENTS OF ERROR NOS. 4 and 5
In these assignments, combined by the defendant, he asserts the district court erred in denying his pretrial motion for continuance (due to publicity) and his motion for mistrial (alleging publicity had tainted the jury venire).
Prior to the motion for continuance, filed on January 11, 1995, the lower court had denied the defense's requests for closure of the suppression hearing and closure of the closure hearing. Articles then appeared in the area newspaper, the Alexandria Daily Town Talk, discussing evidence and issues related to the case. The defendant filed some of the newspaper articles with his motion for continuance, arguing inadmissible evidence was being disseminated and prejudicial pretrial publicity was increasing.
The state countered that the motion was premature because there was no showing as to whether a fair and impartial jury could be selected. The trial court denied the defendant's motion for continuance. Subsequently, during the voir dire, defense counsel moved for a mistrial, arguing that media publicity and courthouse discussions overheard by potential jurors had tainted the venire. The district court denied the motion.
The defense argues the lower court abused its discretion in denying the motion, citing this court's decision in State v. Roman, 473 So.2d 897 (La.App. 3 Cir.1985), where the defendant's conviction was reversed due to the jury's exposure to pretrial publicity. However, the state argues Roman is distinguishable because the trial judge in that case failed to instruct the jury not to watch or read any news accounts of the trial and later, five of the impanelled jurors admitted to reading an article about the case.
In the case sub judice, the trial court took steps to limit the effects of pretrial publicity. The venue was changed from Monroe to Alexandria. During voir dire, the court allowed individual interviews of every juror who claimed to have heard or read about the case. Some of these jurors were excused because they admitted that they could not be impartial at trial. The court also granted the defense's request to instruct the jury, at every break, not to discuss any information related to the case, and not to read, watch or listen to media accounts of the case.
"A mistrial is not warranted absent a determination the jurors were actually exposed to the publicity in question and were so impressed by it as to be incapable of rendering a fair and impartial verdict." (Emphasis added.) State v. Hunter, 551 So.2d 1381, 1385 (La.App. 3 Cir.1989). Although Bolden has demonstrated there was publicity before and during trial, he has not shown that jurors were so influenced they could not render a fair verdict.
Considering the facts and law, the trial court did not abuse its discretion in denying Bolden's motions for a mistrial and continuance. These assignments are without merit.

ASSIGNMENT OF ERROR NO. 6
By this assignment, the defendant alleges the trial court erred in instructing the general venire on specific points of law while the defendant was absent. On January 17, 1995, the court called potential jurors into the courtroom and proceeded to qualify the jury. The defendant had waived his presence as to the "initial qualifying" of the voir dire. After discussing qualifications with the venire and excusing several potential jurors, the court instructed the remaining jurors on general legal and constitutional principles:

*26 A defendant begins the case with a clean slate and he isand he carries this presumption of innocence all the way throughout the trial until such time as the State proves his guilt beyond a reasonable doubt. I'm not going to define for you reasonable doubt now because that will come at a later time. I will say this, that reasonable doubt does not mean beyond a shadow of a doubt or beyond all doubt. It is reasonable doubt. I suggest to you that nothing could be proven beyond all doubt or beyond a shadow of a doubt. But those are common words that people have learned to use over the years, but those words again, ah, are not found in a court of law.
In all criminal proceedings it is the responsibility of the State or the district attorney to prove the defendant's guilt beyond a reasonable doubt. The State has the burden of proof. And the entire responsibility falls on the State. What I am about to tell you may shock some of you, but a defendant is not required to prove his innocence.
The defendant cites La.Code Crim.P. art. 831, which states in pertinent part:
Except as may be provided by local rules of court ... a defendant charged with a felony shall be present:
* * * * * *
At the calling, examination, challenging, impanelling, and swearing of the jury or of a juror.
* * * * * *
Although he had waived his presence during the initial qualification of the voir dire, Bolden now complains he did not waive his presence where legal instruction was involved. He now asks for summary reversal of the conviction.
Similar legal instructions have appeared without comment elsewhere in the caselaw. See, e.g., State v. Belgard, 410 So.2d 720 (La.1982); State v. Knighten, 609 So.2d 950 (La.App. 4 Cir.1992). Additionally, the language complained of occurred before the prospective jurors were examined. Defense counsel had a full opportunity to examine members of the venire and determine their attitudes toward reasonable doubt, the presumption of innocence, and other legal principles.
Although we have found no cases on point, the lone case cited by the defense, State v. Lewis, 531 So.2d 1169 (La.App. 4 Cir.1988), is clearly distinguishable. In that case, the defendant was late for trial, and the district court allowed jury selection to begin without the defendant present. Seven jurors were selected by the time Lewis arrived. The appellate court held the defendant was not voluntarily absent from court where he had car trouble, and therefore he was entitled to a mistrial or new trial when a portion of the jury was selected in his absence.
In the case sub judice, the defendant was clearly in a position to protect his rights during jury selection. In addition, the normal process for charging the jury was carried out at the end of trial, ensuring that the jury was fully aware of the proper legal principles prior to deliberation.
Violations of Article 831 regarding arraignment have been subjected to harmless error analysis. See, e.g., State v. McKinney, 93-1425 (La.App. 4 Cir. 5/17/94), 637 So.2d 1120; State v. Brown, 620 So.2d 508 (La.App. 5 Cir.), writ denied, 625 So.2d 1062 (La. 1993). However, these cases relied partly upon La.Code Crim.P. art. 555, which specifically allows for waiver of some arraignment errors.
Under the jurisprudence, "trial errors" are subject to harmless error analysis, while "structural errors" are not. A "trial error" is an error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented. Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). In Sullivan v. Louisiana, 508 U.S. 275, 277, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993), the court stated that the test for harmless error "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error."
*27 Although the current error does not fit this definition exactly, it is the type of error that may be "quantitatively assessed" in light of the rest of the trial proceedings. Although the trial judge erred in making the comments at issue, we conclude that such error was harmless to the defendant. Under the present facts, it is clear that the guilty verdict in this trial was unattributable to this error. For these reasons, even if error occurred, it was clearly harmless, as there was no reasonable likelihood the general legal ideas outlined before voir dire contributed to the defendant's conviction and sentence in this trial.

ASSIGNMENT OF ERROR NO. 7
In this assignment, the defendant alleges the trial court erred in overruling his Batson objections. Bolden points out that he is an African-American and that the state exercised several peremptory challenges for potential jurors who were African-American. During jury selection, the defense requested that the state explain its reasons for excusing four prospective jurors: Della Fields, Saiquanda Madden, Tina Williams, and Neonika Vaughn.
The prosecution explained that Madden was very young (still in high school), and the state had "information" about her husband (apparently unfavorable). Regarding Williams, the state noted that three of her siblings had been convicted of crimes. As to Vaughn, the state explained that it felt she had developed a rapport with the defendant by making eye contact with his lawyers, smiling at him, and nodding as his lawyers asked questions of other potential jurors. The same reasons were given for the exclusion of Fields.
The court accepted the prosecution's reasoning and overruled the defendant's objection to the potential jurors' exclusion. Later, the court also overruled the defense's objection to the exclusion of Henry Marsland from the jury. The prosecution explained that Marsland's background of working with juveniles might cause him to tend toward leniency.
The defendant cites the rule that the state's peremptory challenges may not be based solely upon the potential juror's race. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); La.Code Crim.P. art 795(C). The state acknowledges this rule, but cites Purkett v. Elem, ___ U.S. ___, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) for its discussion of Batson challenges. Under Purkett, once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination, the burden shifts to the proponent of the challenge to give a race neutral explanation. Once such an explanation is tendered, the trial court must then decide whether the opponent of the peremptory challenge has proven purposeful racial discrimination. Under Purkett, the reason will be deemed race-neutral, unless the explanation has an inherently discriminatory intent. Purkett, 115 S.Ct. at 1771.
While the defense includes Batson in its argument, it also argues jurisprudence interpreting La.Code Crim.P. art. 795(C-E), which provides:
C. No peremptory challenge made by the state or the defendant shall be based solely upon the race of the juror. If an objection is made that the state or defense has excluded a juror solely on the basis of race, and a prima facie case supporting that objection is made by the objecting party, the court may demand a satisfactory racially neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror. Such demand and disclosure, if required by the court, shall be made outside of the hearing of any juror or prospective juror.
D. The court shall allow to stand each peremptory challenge exercised for a racially neutral reason either apparent from the examination or disclosed by counsel when required by the court. The provisions of Paragraph C and this Subsection shall not apply when both the state and the defense have exercised a challenge against the same juror.
E. The court shall allow to stand each peremptory challenge for which a satisfactory racially neutral reason is given. Those jurors who have been peremptorily *28 challenged and for whom no satisfactory racially neutral reason is apparent or given may be ordered returned to the panel, or the court may take such other corrective action as it deems appropriate under the circumstances. The court shall make specific findings regarding each such challenge.
Purkett was recently cited by the Louisiana Supreme Court for its Batson analysis in State v. Green, 94-0887 (La. 5/22/95); 655 So.2d 272. Finding the state had sustained its burden of articulating race-neutral reasons for its peremptory challenges, the Green court stated:
The stated reasons for striking Devezin were that her husband's uncle worked with juveniles and that she showed some weakness in her willingness to apply the death penalty. The stated reasons for striking Price were that he worked for HANO for over twenty (20) years and that he previously sat on a jury which "voted on a police case of a lesser charge."
Without belaboring the point we find that these reasons are facially "race-neutral." They contain none of the cultural, geographic, or linguistic classifications which, due to the ease with which such classifications may serve as a proxy for an impermissible classification, invite particularly exacting scrutiny. Compare Hernandez [v. New York], supra, 500 U.S. [352] at 357, 111 S.Ct. [1859] at 1868[, 114 L.Ed.2d 395 (1991)] (prosecutor's striking of Spanish-speaking jurors "raised a plausible, though not a necessary, inference that language might be a pretext for what in fact were race-based peremptory challenges"). [94-0887 La. at 27, 655 So.2d at 289] In short, we conclude that none of the reasons articulated by the prosecutor, e.g. employment with a governmental agency, are readily associated with the suspect class which is alleged to be the object of the prosecutor's discriminatory use of peremptory strikes, i.e. prospective black jurors.
This circuit has previously accepted state explanations similar to those advanced in the present case as race-neutral. In State v. Aubrey, 609 So.2d 1183, 1187 (La.App. 3 Cir.1992), the court catalogued a series of reasons it deemed acceptable:
Judy Semien, a single mother of one, indicated sexual casualness; Nolan White can not read and is a friend of the defendant's attorney's mother; Ronald Stelly has a ninth grade education and indicated that the defendants looked familiar; Christine Reed, a single twenty-four year old, is too young and seemed infatuated with the defendants; Marie Savoy seemed inattentive and uninterested in the proceedings; Gloria Robert had previously served on a rape case; Marvaer Richard was excused for cause; Mary Payne wore dark sunglasses in the court and indicated that the defense attorney was the attorney of her niece (actually, the record indicates that the defense attorney was her own attorney and her niece worked for him); Patsy Morgan may have been familiar with the defendants because she lived in the Carencro area; Janice Morris entered the court with curlers in her hair; Rose Milton is a single parent which indicated sexual casualness; Frances Mayfield's husband was convicted and imprisoned for drug distribution; Wanda Williams and Patsy Lewis know the defense attorney; Lisa Ledoux is single, young, and was making excessive eye contact with one of the defendants; Peter Thomas seemed too sympathetic with the defendants; Lucille Richard, Janice Pitre Vanwright, Louise Marcel, and Nancy Lloyd were excused because the prosecutor felt there were enough women on the jury at that stage of the proceedings; and, Louise Marcel additionally indicated that she knows the defense attorney.
In the case sub judice, we conclude that the prosecutor gave valid, facially race-neutral reasons for peremptorily challenging the five jurors. The reasons given were not pretextual in nature, and the challenges did not serve to systematically exclude African-Americans solely on the basis of race. This assignment has no merit.

ASSIGNMENT OF ERROR NO. 8
During jury selection, the defendant attempted to challenge five prospective jurors for cause: Kathleen Ussery, Emily Johnson, Jamie Gauthier, Alan Augustine, and Raymond *29 Dube. The defendant notes the minutes show only eleven of his peremptory challenges were exercised, but he argues the record reveals he used all twelve. His contention appears to be correct. Although the minutes show only eleven peremptory challenges were used by the defense, the record reveals that Roberta Young, shown in the minutes as the state's ninth peremptory challenge, was actually the defendant's final peremptory. The state does not dispute this point in its brief.
Peremptory challenges were made in bench conferences held off the record; some challenges for cause may also have been off the record. We have obtained the "challenge sheets" from the Ninth District to help clarify the matter. The challenge sheets indicate the defense used all twelve peremptories.
This point is important because if a defendant uses all his peremptory challenges, prejudice is presumed when a challenge for cause is erroneously denied. However, even if he does not use all peremptory challenges, a defendant may still demonstrate prejudice from the error. La.Code Crim.P. art. 800; State v. Robertson, 92-2660 (La. 1/14/94), 630 So.2d 1278. In the case sub judice, the documentation of the peremptories is sufficient for the court to presume prejudice if error is found.
Two of the potential jurors had close connections with law enforcement. Johnson indicated her husband is a State Farm claims adjuster and a reserve deputy with the local sheriff's office, and Ussery testified she had been the police chief's secretary for roughly six years. The defense challenged both jurors for cause. The court denied the challenge to Ussery without comment; in denying the challenge to Johnson, the court expressed some uncertainty as to the law regarding reserve policemen's jury service.
Pressing his argument, the defendant cites State v. Hallal, 557 So.2d 1388, 1389-90 (La. 1990), appeal after remand, 594 So.2d 1071 (La.App. 3 Cir.1992):
"A challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to the law may be reasonably implied." (Citations omitted).
As the defendant notes, Hallal's conviction was reversed because this court held the lower court erred in failing to grant a challenge for cause for a prospective juror whose husband was a fifteen-year veteran of the local sheriff's office. Although the juror testified she could follow the law, she never expressly stated she would be able to assess the case impartially. Therefore, the defendant's exhaustion of his peremptory challenges mandated reversal. Id.
The state distinguishes Hallal, noting that in the present case, the crime was committed outside the parish where the case was tried, and the primary witnesses were law enforcement officials from another state, rather than the local police department or sheriff's office. The state is essentially correct, because the Hallal court focused not on the juror's status in relation to law enforcement, but rather upon her personal knowledge and impressions due to friendships she had formed at work. The Hallal juror testified she would tend to believe the state's police witnesses, "[n]ot because they were law enforcement officers, but because I know them." Hallal, 557 So.2d at 1389. Ussery stated that the fact that a person testifying is a police officer would not cause her to automatically believe the testimony. Thompson and Ussery said they could apply the reasonable doubt standard. The "personal connection" shown in Hallal did not exist in Bolden's trial, and thus, that case's reasoning does not apply here.
The defense also unsuccessfully challenged Jamie Gauthier for cause. During voir dire examination, Gauthier revealed he had prior knowledge of the case because his brother was on duty as a security guard the night Brenda Spicer was murdered. Gauthier had also gleaned information from the local newspaper, remembering that a confession was involved in the case. Gauthier stated he would have no problem applying the reasonable doubt standard.
Another juror challenged for cause, Alan Augustine, had heard information about the *30 case during conversations while he awaited examination. He heard that Bolden had killed an NLU basketball player and her roommate. He also heard the defendant "somehow got off and then moved to Tennessee and then slapped some girl around there and she turned him in and he had confessed to her that he had killed those girls or something like that." Augustine testified he could give the defendant a fair trial. The district court denied the challenges for cause.
The defendant contends that Gauthier and Augustine should have been excluded from the trial jury. In State v. Goodson, 412 So.2d 1077, 1081 (La.1982), appeal after remand, 437 So.2d 1174 (La.App. 2 Cir.1983), the court stated:
Both the degree of exposure and the prospective juror's testimony as to state of mind are relevant to the determination of acceptability. A prospective juror testifying to an inability to overcome preconceptions shall be subject to challenge for cause no matter how slight the exposure. If the prospective juror remembers information that will be developed in the course of the trial, or that may be inadmissible but does not create a substantial risk of impairing judgment, that person's acceptability shall turn on the credibility of testimony as to impartiality. If the formation of an opinion is admitted, the prospective juror shall be subject to challenge for cause unless the examination shows unequivocally the capacity to be impartial. A prospective juror who has been exposed to and remembers reports of highly significant information, such as the existence or contents of a confession, or other incriminating matters that may be inadmissible in evidence, or substantial amounts of inflammatory material, shall be subject to challenge for cause without regard to the prospective juror's testimony as to state of mind. (Emphasis added.)
In the caselaw since, there has been no real discussion of damage that prior knowledge of a confession can do to a juror's impartiality, and later cases have not cited Goodson for this exact point. However, the Goodson court clearly considered prior knowledge of a confession among the most tainting factors possible, and one that does not allow for rehabilitation. The Goodson court clearly delineated degrees of taint for potential jurors. Apparently, the Goodson court decided advance knowledge of a confession was so prejudicial that rehabilitation should not even be pursued.
Goodson is distinguishable in two respects. First, the primary issue in that case was change of venue. The defendant was charged with committing a rape in Bossier Parish as well as with a series of rapes in the Highland area of Shreveport in Caddo Parish. Prior to his arrest, the media had identified the then-unknown suspect as "the Highland rapist." Post-arrest publicity indicated that Goodson was "the Highland rapist," identifying him as the perpetrator of the Caddo and Bossier rapes.
Goodson filed a motion for a change of venue in the Bossier proceeding, and it was denied. The trial judge found that although the publicity was widespread, the defendant had not demonstrated prejudice in the public mind. The Louisiana Supreme Court concluded that Goodson had not shown such prejudice that a fair trial would be impossible. The high court vacated the district court's ruling and remanded the case with orders that a final ruling on the motion to change venue be deferred until completion of the voir dire. At this point, the high court ordered use of the American Bar Association's Standards Relating to Fair Trial and Free Press § 8-3.5 (1978), which are contained in the prior quotation from Goodson. The case is distinguishable because it requires a preliminary finding of prejudice and it applies only to venue questions. Goodson was never intended to apply as a standard for challenges for cause. Typically, Goodson is cited in reference to the change of venue issue. See State v. Lee, 559 So.2d 1310 (La. 1990), cert. denied, 499 U.S. 954, 111 S.Ct. 1431, 113 L.Ed.2d 482 (1991), rehearing denied, 500 U.S. 938, 111 S.Ct. 2068, 114 L.Ed.2d 472 (1991); State v. Long, 590 So.2d 694 (La.App. 3 Cir.1991). Also, using Goodson as a standard for causal challenges is in contradiction of La.Code Crim.P. art. 797(2), *31 which clearly provides for rehabilitation of biased jurors.[4]
Second, Goodson refers to the potential juror who knows of a confession, "or other incriminating matters that may be inadmissible in evidence ..." Goodson, 412 So.2d at 1081. (Emphasis added.) Here, the confession was not only admitted, it was the key component of the state's case. The confession forms the basis of the perjury charge. Obviously, the whole jury heard the April 23, 1991 statement at trial; thus, we find it unclear how prior knowledge of the existence of the confession affected their decision or prejudiced them unfairly against Bolden.
Dube was apparently on a jury panel from which the alternate juror was selected; the record reflects he did not serve on the jury; neither did the defendant exercise a peremptory challenge in order to exclude him. Therefore, as a factual matter, no prejudice resulted to the defense as to this particular venireman.
For the reasons discussed, this has no merit.

ASSIGNMENTS OF ERROR NOS. 9, 10 and 11
By these combined assignments, the defendant alleges the trial court erred in making erroneous evidentiary rulings. Bolden complains that:
1. The use of a redacted rights form was misleading and inaccurate, severely prejudicing him;
2. The trial court refused to grant a mistrial when the state was allowed to re-play Bolden's taped statement of April 23, 1991;
3. The trial court erred in allowing the state to introduce photographs, including autopsy photographs; Bolden alleges the pictures' prejudicial effect outweighed their probative value.
Regarding the rights form, the defendant notes the original form referenced both the polygraph test and the Tillis murder in Tennessee. For trial, the state used a redacted form, without information about the polygraph or the other crimes. The defendant objected at trial and now complains the abridged form caused a "false impression" that the defendant was properly informed of his rights immediately prior to giving his statement to police. The remainder of his argument is virtually identical to that made under assignment number three, i.e., that Bolden was never properly Mirandized. In fact, he again argues the admissibility of the form. As such, the discussion of law under assignment of error number three applies to the present argument; therefore, like the third assignment, it lacks merit.[5]
Bolden also complains the replay of his inculpatory statement to police was error. When it was initially played, the tape did not correspond to the transcripts the state had provided to the jury. Because of a problem with the tape, the trial court allowed the state to play the tape again. Before it was replayed, the defendant moved for mistrial, arguing the tape's content would thereby be enhanced, thus prejudicing him. The court allowed the tape to be replayed but without giving the jury a transcript for the replay. Bolden argues the statement gained undue weight, as it was the state's key evidence. Interestingly, he cites only La.Code Crim.P. art. 17, which states the trial court must "so control the proceedings that justice is done."
We have found no similar case on point. We observe, however, that State v. Guiden, 399 So.2d 194 (La.1981), cert. denied, 454 U.S. 1150, 102 S.Ct. 1017, 71 L.Ed.2d 305 *32 (1982) held that a statement admitted during the case in chief may be repeated during closing arguments. That being the case, we conclude that replaying the tape in the case sub judice was no more prejudicial than replaying during closing arguments would have been. Just because the jury heard it twice does not mean it gave undue weight to the statement's substance. The defendant has not demonstrated any resulting prejudice. Thus, there is no merit to the defendant's argument.
Finally, the defendant contends that the lower court erred by allowing the state to introduce photographs which had been previously introduced at the 1988 murder trial. The defense filed a motion in limine before trial, objecting to the use of the photographs, arguing that their probative value was outweighed by their prejudicial effect. Bolden argues the photographs were inflammatory and did not serve to illuminate any material issues before the jury. He cites State v. Nix, 327 So.2d 301 (La.1975), cert. denied, 425 U.S. 954, 96 S.Ct. 1732, 48 L.Ed.2d 198 (1976), affirmed, 462 U.S. 111, 103 S.Ct. 2261, 76 L.Ed.2d 794, rehearing denied, 463 U.S. 1236, 104 S.Ct. 29, 77 L.Ed.2d 1451 (1983).
The defense also objected, based upon the Louisiana Supreme Court's earlier decision in this case, claiming double jeopardy and collateral estoppel. Bolden argued that under the high court's holding, any evidence used at the 1988 murder trial should be excluded.
Seven photographs were introduced over the defendant's objections, and the state adduced testimony referring to them. Rudeen Cranford testified that pictures S-4 and S-5 accurately depicted a mini-warehouse in Monroe; Monroe Police Sergeant Jim Gregory identified S-4 through S-7 as accurate depictions of scenes involved in the case; Dr. McCormick stated he was familiar with S-10, S-11, and S-13, and that they accurately represented the cause of death.
The state counters the arguments based on Nix and Bolden asserting that the photographs were introduced as corroboration for the statement Bolden gave to New Jersey authorities. We have already dealt with the collateral estoppel issue in assignment of error number seventeen and found it to be lacking in merit. Therefore this aspect of defendant's argument has been decided and is now moot.
Regarding possible prejudice from the photographs, the test is well-established: potential prejudice must be weighed against probative value. State v. Robinson, 93-905 (La.App. 3 Cir. 3/2/94); 634 So.2d 1274. The pictures introduced into evidence had probative value because they tended to corroborate Bolden's statement to police, in which he said Brenda Spicer met him at a small storage warehouse near the NLU campus: he strangled her there, then dumped her corpse into an on-campus dumpster. If this statement is true, then his testimony at the 1988 murder trial amounted to perjury. Thus, the photographs had a high probative value on the ultimate issue, Bolden's veracity. In balance, their potential prejudicial impact was slight because the photographs, taken as a whole, are not unduly gruesome.
Photographs which illustrate or illuminate any fact or issue, or which are relevant to describe the person, place, or thing depicted are generally admissible. Additionally, the use of photographs at trial is generally left to the trial judge's discretion; his ruling will not be disturbed absent a clear showing of abuse of that discretion. State v. Dugar, 93-718 (La.App. 3 Cir. 10/5/94), 643 So.2d 870; writ denied, 94-2712 (La. 6/30/95), 657 So.2d 1019. Our review of the pictures admitted does not indicate the lower court abused its discretion in admitting them.
For the reasons discussed, this assignment lacks merit.

ASSIGNMENT OF ERROR NO. 12
In this assignment, the defendant alleges the trial court erred in its instruction to the jury on the subject of reasonable doubt. When the trial had concluded, the court gave the instruction in the following statements:
The defendant is not required to prove that he is innocent. Thus, the defendant begins the trial with a clean slate.

*33 The burden is entirely upon the State to prove the defendant's guilt beyond a reasonable doubt. This does not mean that the State must prove the defendant's guilt beyond a shadow of a doubt or beyond all doubt. The standard is beyond a reasonable doubt.
It is the duty of the Jury in considering the evidence or lack thereof to apply to that evidence the law as given by the Court and to give the defendant the benefit of every reasonable doubt arising out of the evidence or out of the lack of evidence.
It is the duty of the Jury, if not convinced of the guilt of a defendant beyond a reasonable doubt, as to any fact or element necessary to constitute the defendant's guilt, to give him the benefit of that doubt and return a verdict of not guilty.
And even where the evidence demonstrates a probability of guilt, yet, if it does not establish it beyond a reasonable doubt, you must find him not guilty.
While the State must prove guilt beyond a reasonable doubt, it does not have to prove guilt beyond all possible doubt.
Reasonable doubt is doubt based on reason and common sense, and is present when, after you have carefully considered all of the evidence, you cannot say that you are firmly convinced of the truth of the charge.
It is not a doubt concocted in your mind out of a feeling of sympathy for the defendant to escape the just penalty of the law. Instead, it is a doubt arising out of the evidence or lack of evidence in the case.
If, after giving a fair and impartial consideration to all facts in this case, you find the evidence or lack of evidence unsatisfactory upon any single point indispensably necessary to constitute the defendant's guilt, this would give rise to such a reasonable doubt as would justify you in rendering a verdict of not guilty.
On the other hand, if you have no reasonable doubt, and the State has convinced you of the defendant's guilt, your duty then is to render a verdict of guilty.
In your deliberations, you, as the jurors, are the exclusive judges of the facts. You must find from the evidence or lack of evidence presented to you during this trial what facts have been proven and what facts have not been proven.
Excuse me.
In doing this, however, you are prohibited by law and by your oath from going beyond the evidence or lack of evidence to seek for doubts upon which to find the defendant not guilty or for persuasions upon which to base a verdict of guilty.
You must confine yourselves strictly to a dispassionate consideration of the evidence or lack of evidence given you upon the trial.
The defense objected, claiming this was an improper definition of reasonable doubt.
The proper standard for assessing reasonable doubt instructions is whether there was a reasonable likelihood that the jury applied the allegedly erroneous instruction in an unconstitutional manner. The challenged terms are considered in relation to the instruction as a whole. State v. Smith, 91-0479 (La. 5/23/94), 637 So.2d 398, certiorari denied, ___ U.S. ___, 115 S.Ct. 641, 130 L.Ed.2d 546 (1994). See also Victor v. Nebraska, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994).
In Smith, 637 So.2d at 399 the jury was charged as follows:
The defendant is presumed to be innocent until he is proved guilty beyond a reasonable doubt. The consequence of this rule is that he is not required to prove his innocence but may rest upon the presumption in his favor until it is overcome by positive affirmative proof.
The onus, therefore, is on the State to establish to your satisfaction and beyond a reasonable doubt, the guilt of the accused as to the crime charged or any lesser one included in it.
If you entertain any reasonable doubt as to any fact or element necessary to constitute the defendant's guilt, it is your sworn duty to give him the benefit of that doubt and return a verdict of acquittal.
Even where the evidence demonstrates a probability of guilt, yet, if it does not *34 establish it beyond a reasonable doubt, you must acquit the accused.
This doubt must be a reasonable one, that is one founded upon a real, tangible, substantial basis and not upon mere caprice, fancy or conjecture. It must be such a doubt as would give rise to a grave uncertainty raised in your minds by reason of the unsatisfactory character of the evidence; one that would make you feel that you had not an abiding conviction to a moral certainty of the defendant's guilt.
If after giving a fair and impartial consideration to all the facts in the case you find the evidence unsatisfactory upon any single point indispensably necessary to constitute the defendant's guilt, this would give rise to such a reasonable doubt as would justify you in rendering a verdict of not guilty.
A reasonable doubt is not a mere possible doubt. It should be an actual or substantial doubt. It is such a doubt as a reasonable person would seriously entertain. It is a serious doubt for which you could give a good reason.
The Smith court characterized this instruction as describing reasonable doubt in terms of its existence, rather than as to magnitude of guilt. The court noted that the terms "substantial doubt" and "grave uncertainty" were separated within the instruction, thereby preventing the danger of overstatement. Also, the high court indicated the term "grave uncertainty" had been used in a manner that merely showed reasonable doubt is more than a speculative doubt. Thus, viewing the charge as a whole, the Smith court held it was not constitutionally deficient.
The instruction in the instant case similarly avoids error. The judge's various descriptions of reasonable doubt merely served to show the jury that reasonable doubt is more than a speculative doubt. Additionally, on its face the trial court's term "firmly convinced" does not suggest the high degree of doubt potentially indicated by the phrase "grave uncertainty," a phrase which was a point of contention in Smith. We conclude that, as in Smith, the charge as a whole was not constitutionally deficient.
For the reasons discussed, this assignment lacks merit.

ASSIGNMENTS OF ERROR NOS. 13 and 14
By these assignments, the defendant complains the lower court erred by not giving all the defense's requested jury instructions. The defense wanted eleven additional instructions; the court gave four of them. The defendant objected, and filed the remaining seven into the record.
On appeal, the defendant specifically complains about the exclusion of requested instructions 1-4, which declared that an out-of-court statement is not, of itself, sufficient to support a perjury conviction. Further, these instructions would have advised the jury that Bolden's statement must be weighed in conjunction with other evidence unavailable at the murder trial. The fourth instruction specifically stated any evidence used at the 1988 trial "would be legally insufficient and impermissible for you to consider." These instructions, and his current argument, are based upon his interpretation of the Louisiana Supreme Court's recent decision as to double jeopardy in this case.
He focuses on footnote five in the high court's decision:
We recognize that under our decision in State v. Elsby, 416 So.2d 60 (La.1982), the new evidence (the unsworn statement to police) may be insufficient by itself to convict defendant of perjury. It will be up to the state at trial to produce corroborating evidence to show that defendant's statements to the New Jersey authorities were in fact truthful. Since we do not know what evidence the state plans to rely on in this regard, it would be inappropriate to speculate on its admissibility at this time.
Bolden, 639 So.2d at 726, n. 5. (Emphasis added.)
The relevant statute is La.Code Crim.P. art. 807, which states in pertinent part:
A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It *35 need not be given if it is included in the general charge or in another special charge to be given.
This court has previously explained the demands of Article 807:
A special charge that is wholly correct and pertinent must be given by the court. State v. Arnaud, 412 So.2d 1013 (La.1982). A requested charge that is not supported by the evidence or requires qualification, limitation, or explanation need not be given. State v. Belgard, 410 So.2d 720 (La. 1982), and State v. Smith, 414 So.2d 1237 (La.1982). A special charge that is substantially included in the general charge or in another special charge, although not necessarily verbatim, need not be read to the jury. State v. Gipson, 359 So.2d 87 (La.1978), and State v. Simmons, 422 So.2d 138 (La.1982).
State v. Obney, 505 So.2d 211, 218 (La.App. 3 Cir.), writ denied, 508 So.2d 818 (La.1987).
Additionally, the supreme court has held that failure to read a special charge constitutes reversible error only when there is a miscarriage of justice, prejudice to the accused's rights, or violation of constitutional or statutory rights. State v. Edwards, 93-2596 (La. 5/4/94); 637 So.2d 600. The defendant suffered no prejudice, as the jury heard significant evidence to corroborate the unsworn confession.
The defendant's interpretation of footnote five in Bolden is not correct. The court said that the unsworn statement by itself may be insufficient to convict him of perjury. The footnote also clearly does not require that the statement be corroborated solely by or weighed against other evidence unavailable at the prior murder trial. Additionally, the fourth instruction requested is not a correct interpretation of Bolden.
For these reasons, defendant has not shown that he has been prejudiced or that his rights were violated. These assignments lack merit.

ASSIGNMENT OF ERROR NO. 15
In this assignment, the defendant complains the trial court erred in overruling his request for a mistrial when the state commented during rebuttal on the defendant's failure to subpoena a witness. He claims that this amounted to an impermissible comment on Bolden's failure to present a defense. The defense made the following contention during closing arguments:
Why didn't the mystery man, Fitzpatrick, come down to testify? You know, the man that Detective Cook didn't see in the interrogation room.
During rebuttal, the state replied:
Then he asked: Why didn't Fitzpatrick come down here? The defense, ladies and gentlemen, has the same subpoena power the state has. If there was anything significant to it, they could have subpoenaed him also.
In an analogous case from the second circuit, State v. Banks, 627 So.2d 756 (La.App. 2 Cir.1993), Banks' defense attorney suggested during cross examination that the defendant was the subject of mistaken identity and alleged the theory again during closing arguments. Specifically, he contended there was a certain person who looked like the defendant. On rebuttal, the state said,
Well, if they had a look-alike for Melvin Banks ... don't you think they would have called and sent over and had to have this fellow[?]
Id. at 757.
Analyzing the comments, the court held that the prosecution remark was neither a direct nor indirect reference to the defendant's failure to testify. Rather, it addressed a theory of the defense and reflected no intent on the state's part to comment on Banks' decision not to take the stand or otherwise present a defense. Id. at 757-58.
The same reasoning applies here. Clearly, there was no direct reference to Bolden's failure to testify or to present a defense. The state's remark merely answered the defendant's argument. Under the reasoning in Banks, there was no error.
Therefore, this assignment has no merit.

ASSIGNMENT OF ERROR NO. 18
In his final assignment, the defendant complains the lower court committed error by imposing the maximum sentence available and by failing to give him credit for *36 time served. The trial court had a presentence investigation report prepared and allowed the defense to comment on the report at the sentencing hearing. The court then read its written sentencing remarks and sentenced Bolden to ten years at hard labor, the maximum provided for under the statute. The court ordered the sentence to run consecutively with any previously imposed sentence, including his Tennessee sentence for the manslaughter of Joel Tillis. In his motion to reconsider sentence, the defendant noted that the Louisiana Sentencing Guidelines call for a sentencing range from eighteen to twenty-four months and argued the ten year sentence was essentially punishment for the Spicer murder, thus violating double jeopardy. The court denied the motion. The defense also pointed out that Bolden had not been afforded credit for time served; the lower court then denied said credit, over defendant's objection, because the defendant is currently serving his Tennessee sentence.
Supporting the denial of credit for time served, the state cites State v. Barnes, 590 So.2d 1298 (La.App. 1 Cir.1991). That case notes that one jurisdiction generally will not give credit for time served in another jurisdiction. The defendant clearly falls within that rule because he was already under sentence for manslaughter in Tennessee when he was extradited to stand trial in Louisiana.
In State v. Townley, 94-1002 (La.App. 3 Cir. 5/3/95); 657 So.2d 129, this court pointed out that the defendant's sentence (made consecutive) did not even begin until his currently running sentences had been served in full. Thus, any time served up to that point could not count toward a sentence which had not even begun. Under this reasoning, Bolden would not be entitled to time served because he is currently serving his manslaughter sentence and has not been held in custody for the sole purpose of awaiting trial on the present charge.
The defense also argues the district court should not have imposed the maximum sentence in this case. The state counters that the sentencing guidelines are advisory only, and higher sentences are warranted where particular circumstances differentiate the situation from a "typical" case. Maximum sentences should be used for the worst offenders. As the district court observed:
To begin with this is not a typical case. This is not a case where an individual took an oath to tell the truth and instead lied with reference to a civil proceeding such as a divorce or even in a criminal proceeding to provide an alibi or other defense for someone else. No, this case involved the ultimate lie, that the defendant did not kill Brenda Lee Spicer, when in fact he did.
In preparing for this sentence the Court took the time to review most of the testimony in the defendant's trial for second degree murder in March of 1988. It is a bit ironic that the witness who gave the defendant an alibi, Marliss(ph) Bates was the mother of the defendant's second victim, Joel Tillis.
It is also an unwritten rule or axiom among criminal defense attorneys that you don't put the defendant on the witness stand unless he can help or win his case. Having personally observed the defendant in Court on a number of occasions and after reading his testimony given during his trial for murder he obviously impressed the jury with his intelligence, education background, awards and honors he'd received, and then told the jury he didn't kill Brenda Spicer. He convinced the jury that there was a reasonable doubt as to his guilt and was found not guilty. So instead of facing prison for life without benefit of probation, parole or suspension of sentence he is now facing a maximum of ten years in prison. No, this is hardly the typical case. This is not a typical case because the defendant's act of perjury has caused extreme mental anguish to the family of Brenda Lee Spicer, not only to her family but to many others as well. One cannot calculate the amount of damage caused by his act of perjury.
The district judge also made reference to the Spicer murder, telling Bolden, "The blood of Brenda Spicer is and always will be on your hands." The judge further referred to details of Bolden's strangulation of Spicer.
The defense argues such commentary indicates the court was in fact sentencing Bolden for the Spicer murder, thus implicating double *37 jeopardy. Although the comments were out of place, the judge's general reasoning is entirely sound. For sentencing purposes, the murder and the perjury were inextricably linked. The state had proven that Bolden lied under oath to bolster his defense in a murder trial. Considering the circumstances of the lie, this case was not a "typical" perjury case, and Bolden is certainly the worst type of offender. More specifically, he is the worst type of perjurer: one who lies under oath to escape a murder conviction. The defendant has confessed to killing Spicer; his prior perjury aided his successful defense. Therefore, it was not error for the judge to mention the murder that formed the background of this case. Regarding the judge's references to public opinion, they were made in the context of the lower court's mention of the change of venue earlier in this case. The poll was specifically commissioned by the court in Monroe to determine if pretrial publicity there had made it impossible for Bolden to receive a fair trial in Monroe. Bolden was in jeopardy for up to ten years as a perjurer; he was properly sentenced.
This assignment of error lacks merit.

DECREE
The defendant's conviction and sentence are affirmed.
AFFIRMED.
THIBODEAUX, J., dissents and will assign reasons.
NOTES
[1] Bolden had already been sentenced for a manslaughter in Tennessee. (See subsequent discussion).
[2] In so holding, the high court refused to quash the following bill of information:

The district attorney for the Parish of Ouachita, State of Louisiana, charges that Bolden, Ivrin, Jr., in the parish and state aforesaid, did: On or about March 11, 1988
Ct. 1Intentionally and knowingly commit [sic] perjury after being sworn as a witness at trial of the matter styled State of Louisiana v. Ivrin Bolden, Jr., No. 45434, Fourth Judicial District Court, Ouachita Parish, Louisiana, a prosecution for which he was being tried for the murder of one Brenda Spicer, by testifying in response to questions concerning whether he had physical contact with and/or killed Brenda Spicer, a matter material to the issue or controversy in question.
[3] If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
[4] See also State v. Lee, 559 So.2d 1310:

When a juror expresses a predisposition as to the outcome of a trial, a challenge for cause should be granted. Yet, if after subsequent questioning the juror exhibits the ability to disregard previous views and make a decision based on the evidence presented at trial, the challenge is properly denied. When assessing whether a challenge for cause should be granted, the trial judge must look at the juror's responses during her entire testimony, not just "correct," isolated answers; or, for that matter, "incorrect," isolated answers. (Citations omitted.)
[5] The defense cites State v. Williams, 575 So.2d 452, 455 (La.App. 4 Cir.1991), writ denied, 578 So.2d 130 (La. 1991), but that case is inapposite. The prosecution in Williams deliberately used blatantly incorrect evidence. Here, the state merely excised inadmissible, prejudicial portions of the rights form.